**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

CAYUGA INDIAN NATION OF NEW YORK,

*Plaintiff,*

No. 11-cv-6004-CJS

-v-

SENECA COUNTY, NEW YORK,

*Defendant.*

**PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO DISMISS
DEFENDANT'S COUNTERCLAIM**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

LEGAL STANDARD ............................................................................................................... 3

ARGUMENT .......................................................................................................................... 4

I.  THE COUNTY'S COUNTERCLAIM SHOULD BE DISMISSED BECAUSE IT
    IS EITHER DUPLICATIVE OR NONJUSTICIABLE. ...................................................... 4

II. COLLATERAL      ESTOPPEL      FORECLOSES      THE      COUNTY'S
    DISESTABLISHMENT CLAIM ...................................................................................... 7

    A.  County Officials Litigated And Lost Their Disestablishment Argument In
        *Gould* ............................................................................................................... 8

    B.  Collateral Estoppel Precludes The County From Relitigating The Status
        Of The Nation's Reservation. ................................................................... 11

III. BINDING      PRECEDENT      FORECLOSES      THE      COUNTY'S
     DISESTABLISHMENT CLAIM AS A MATTER OF LAW ........................................... 12

     A.  Second Circuit Precedent Forecloses The County's Disestablishment
         Claim. ............................................................................................................ 13

     B.  The Treaty Of Buffalo Creek Did Not Disestablish The Cayuga Nation's
         Reservation, As Courts Have Unanimously Held ................................... 14

CONCLUSION ................................................................................................................... 17

# TABLE OF AUTHORITIES

CASES

*Adirondack Cookie Co. v. Monaco Baking Co.*, 871 F. Supp. 2d 86 (N.D.N.Y. 2012) ..................................................................................................................3, 6

*American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) ......................................6

*Angstrohm Precision, Inc. v. Vishay Intertechnology, Inc.*, 567 F. Supp. 537 (E.D.N.Y. 1982)..................................................................................................................11

*Arista Records LLC v. Usenet.com, Inc.*, No. 07 Civ. 8822, 2008 WL 4974823 (S.D.N.Y. Nov. 24, 2008) ...........................................................................................7

*Berrey v. Asarco Inc.*, 439 F.3d 636 (10th Cir. 2006) ....................................................................7

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993) ......................................4

*Cayuga Indian Nation of New York v. Cuomo*, 730 F. Supp. 485 (N.D.N.Y. 1990).....................14

*Cayuga Indian Nation of New York v. Cuomo*, 758 F. Supp. 107 (N.D.N.Y. 1991).....................15

*Cayuga Indian Nation of New York v. Gould*, 930 N.E.2d 233 (N.Y. 2010) ......8, 9, 10, 11, 12, 15

*Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005)...........................16, 17

*Cayuga Indian Nation of New York v. Seneca County*, 761 F.3d 218 (2d Cir. 2014) ...................................................................................................................................3

*Cayuga Indian Nation of New York v. Village of Union Springs*, 317 F. Supp. 2d 128 (N.D.N.Y. 2004) ..............................................................................................14, 15, 16

*Cayuga Indian Nation of New York v. Village of Union Springs*, 293 F. Supp. 2d 183 (N.D.N.Y. 2003) ....................................................................................................4

*Cayuga Indian Nation of New York v. Village of Union Springs*, 390 F. Supp. 2d 203 (N.D.N.Y. 2005) ..................................................................................................14

*Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671 (2d Cir. 1996)..................................................................................................................6

*City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005) ..........................14, 15

*Connecticut General Life Insurance Co. of New York v. Cole*, 821 F. Supp. 193 (S.D.N.Y. 1993)..................................................................................................................11

*Conopco, Inc. v. Roll International*, 231 F.3d 82 (2d Cir. 2000) ....................................................8

*DeCoteau v. District County Court for Tenth Judicial District*, 420 U.S. 425 (1975)..........................................................................................................16

*Gray v. Lacke*, 885 F.2d 399 (7th Cir. 1989)..............................................12

*Gregory v. Chehi*, 843 F.2d 111 (3d Cir. 1988)...........................................12

*Hagen v. Utah*, 510 U.S. 399 (1994) ...........................................................16

*Interscope Records v. Kimmel*, No. 07–CV–0108, 2007 WL 1756383 (N.D.N.Y. June 18, 2007)...........................................................................................5, 7

*Laaman v. United States*, 973 F.2d 107 (2d Cir. 1992) ...............................12

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000)...............................3

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) .............4, 12

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941) ......6

*Mattz v. Arnett*, 412 U.S. 481 (1973)...........................................................16

*Maverick Recording Co. v. Chowdhury*, No. CIVA CV07-640DGT, 2008 WL 3884350 (E.D.N.Y. Aug. 19, 2008)..............................................5, 6, 7

*Maysonet v. Citi Grp., Inc.*, No. 10 Civ. 4616(SAS), 2011 WL 476610 (S.D.N.Y. Feb. 9, 2011) ...............................................................................................8

*Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505 (1991) ..............................................................4

*Oneida County v. Oneida Indian Nation of New York*, 470 U.S. 226 (1985)................16

*Oneida Indian Nation of New York v. Madison County*, 605 F.3d 149 (2d Cir. 2010), *vacated as moot*, 562 U.S. 42 (2010) ..........................................14

*Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d 139 (2d Cir. 2003), *rev'd*, 544 U.S. 197 (2005)...................................13, 14, 16, 17

*Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, 500 F. Supp. 2d 1143 (E.D. Wis. 2007) ..................................................................4, 5, 7

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117 (2d Cir. 2007) .....................................................................................................4

*Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977) ...................................16

*Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962)....................16

*Solem v. Bartlett*, 465 U.S. 463 (1984) ...................................................................15, 16

*South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) ...................................15, 16

*Ulloa v. United States*, No. 1:06-CV-751 NAM/RFT, 2007 WL 2764792
    (N.D.N.Y. Sept. 20, 2007) ...........................................................................................3

*Waldman v. Village of Kiryas Joel*, 39 F. Supp. 2d 370 (S.D.N.Y. 1999), *aff'd*,
    207 F.3d 105 (2d Cir. 2000)......................................................................................12

*Worldwide Home Products, Inc. v. Bed Bath & Beyond, Inc.*, No. 11 CIV. 03633
    LTS, 2013 WL 247839 (S.D.N.Y. Jan. 22, 2013) ....................................................5

**STATUTES**

28 U.S.C. § 2201(a) ........................................................................................................3, 6

Non-Intercourse Act, 1 Stat. 137 (1790), *codified as amended*, 25 U.S.C. § 177 ........16

Treaty of Buffalo Creek, Jan. 15, 1838, 7 Stat. 550 ......................................................17

Treaty of Canandaigua, Nov. 11, 1794, 7 Stat. 44..........................................................2

N.Y. Indian Law § 6 ........................................................................................................2

N.Y. Real Prop. Tax Law § 454.......................................................................................2

**OTHER AUTHORITIES**

25 C.F.R. § 151.10 .........................................................................................................15

Brief of Plaintiff-Appellee Cayuga Nation, *Cayuga Indian Nation of New York v.
    Gould*, 930 N.E.2d 233 (N.Y. Jan. 22, 2010) ..........................................................8

Fed. R. Civ. P. 12(b)(6)....................................................................................................4

Petition for Certiorari, *Gould v. Cayuga Indian Nation*, 562 U.S. 953 (2010) (No.
    10-206), 2010 WL 3256353......................................................................................10

Reply Brief of Defendants-Appellants Cayuga Nation, *Cayuga Indian Nation of
    New York v. Gould*, 930 N.E.2d 233 (N.Y. Feb. 9, 2010) ....................................8, 9

**INTRODUCTION**

The Cayuga Nation filed this action seeking declaratory and injunctive relief preventing Seneca County (the "County") from foreclosing on real property owned by the Nation within the County for failure to pay property taxes. This Court granted, and the Second Circuit affirmed, a preliminary injunction on the ground that the County's foreclosures would violate the Nation's sovereign immunity. Now the County has filed its answer, which includes a counterclaim for a declaratory judgment that "the former Nation reservation has been disestablished."

The County's "counterclaim" is improper and meritless. The County cannot use a "counterclaim" to obtain a ruling on the abstract question of the Nation's reservation status. To the extent the County's counterclaim raises only issues potentially implicated by the Nation's affirmative claims, it is duplicative and should be dismissed on that basis. And if the County's counterclaim seeks anything *beyond* the "mirror image" of the Nation's affirmative claims, the Nation's sovereign immunity would preclude it. Sovereign immunity applies equally to counterclaims, and by bringing its affirmative claims, the Nation did not expressly or impliedly consent to an adjudication of its reservation status in the abstract.

Moreover, on the merits, the County's counterclaim fails as a matter of law. First, the County is collaterally estopped from relitigating the question whether the Nation's reservation remains intact. Five years ago, it litigated that issue right up to the New York Court of Appeals and unsuccessfully petitioned the Supreme Court for certiorari. The Court of Appeals held that the Nation's reservation remains intact as a matter of federal law, and that holding is binding on the County here. Second, controlling Circuit precedent and fundamental principles of federal Indian law refute the County's counterclaim. The Second Circuit has squarely held that the Oneida Nation's reservation, which is identically situated to the Cayuga Nation's, remains intact,

1

and it has rejected exactly the arguments raised in the County's counterclaim—including based on the Treaty of Buffalo Creek. And as to the Cayuga Nation's reservation specifically, *every* federal court to have considered the question—not to mention the New York Court of Appeals—has found that the Nation retains its historic reservation and it has not been disestablished.

## BACKGROUND

The Nation owns certain properties located within the Nation's reservation lands, as acknowledged in the Treaty of Canandaigua, November 11, 1794, 7 Stat. 44. Although the Nation lost possession of those properties more than a hundred years ago due to a series of illegal sales to New York State, the Nation has since reacquired the properties at issue here through a series of open-market purchases. Am. Compl. ¶ 9. The County has sought to collect property taxes, which the Nation contends are unlawful under federal and state law. *Id.* ¶ 12.

After the County notified the Nation that it had commenced foreclosure proceedings based on what it claimed were delinquent taxes, the Nation filed this action seeking a declaration that the County "may not foreclose on, acquire, convey, sell or transfer title to the" properties at issue, and an injunction against such activities. *Id.* at 9-10. As amended, the Nation's complaint claimed that foreclosure and forced sale of these properties would violate the Treaty of Canandaigua; the Indian Commerce Clause; the Non-Intercourse Act, 25 U.S.C. § 177; and the Nation's sovereign immunity. *Id.* ¶ 18. The Nation also claimed that the County's taxes violated New York state law, which exempts from taxation any property within an Indian reservation. N.Y. Real Prop. Tax Law § 454; N.Y. Indian Law § 6; *see* Am. Compl. ¶ 21.

The Nation moved for, and this Court granted, a preliminary injunction "enjoining [the County] from foreclosing on the subject parcels, on the grounds of tribal sovereign immunity." Dkt. 23 at 1. Given the Nation's sovereign immunity, the Court held that "Supreme Court precedent clearly determines that . . . Seneca County does not have the right to collect . . . taxes

by suing to foreclose on the properties"—even assuming that the County had power to levy the taxes in the first place. *Id.* at 5. The Court held that the Nation's sovereign immunity would apply, moreover, "even to foreclosure actions involving property that was never part of an Indian reservation." *Id.* at 12 n.5. The County appealed the preliminary injunction, and the Second Circuit affirmed. *Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 761 F.3d 218 (2d Cir. 2014).

On remand, the County filed its answer pursuant to this Court's scheduling order. Dkt. 36, 37. That answer included a counterclaim for a declaration that "the former Nation reservation has been disestablished as to the subject lands" by the Treaty of Buffalo Creek of 1838, and that the "lands that were formerly the 'Original Reservation' are neither 'Indian country,'" under 18 U.S.C. § 1151," nor part of an 'Indian reservation.'" Answer at 7.

The Nation now moves to dismiss the counterclaim.

## LEGAL STANDARD

Under the Declaratory Judgment Act, in cases of "actual controversy," courts may "declare the rights and other legal relations of any interested party seeking such [a] declaration." 28 U.S.C. § 2201(a). A declaratory judgment counterclaim is subject to dismissal under Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The "actual controversy" requirement "is coextensive with Article III's case or controversy requirement" and forbids declaratory judgments on "abstract question[s]." *Adirondack Cookie Co. v. Monaco Baking Co.*, 871 F. Supp. 2d 86, 91 (N.D.N.Y. 2012). A declaratory judgment is impermissible if it would violate sovereign immunity. *Ulloa v. United States*, No. 1:06-CV-751 NAM/RFT, 2007 WL 2764792, at *5 (N.D.N.Y. Sept. 20, 2007).

A declaratory judgment counterclaim is subject to dismissal under Rule 12(b)(6) when it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While the court accepts factual allegations as true, it gives "no effect to legal conclusions couched as factual allegations." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). The court may consider not just the complaint itself, but any "documents . . . incorporated in [the complaint] by reference" and "matters of which judicial notice may be taken." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

## ARGUMENT

**I.  THE COUNTY'S COUNTERCLAIM SHOULD BE DISMISSED BECAUSE IT IS EITHER NONJUSTICIABLE OR DUPLICATIVE.**

If the Court now reaches the Nation's claims under the Non-Intercourse Act and New York State tax law (rather than relying solely on sovereign immunity), it may ultimately decide the status of the Nation's reservation. As a counterclaim, however, the County's request for a declaratory judgment that the Nation's reservation has been disestablished is nonjusticiable.

*First*, the County's counterclaim violates the Nation's sovereign immunity. This immunity, there can be no dispute, would normally bar the County's claim concerning the Nation's reservation. And as the Supreme Court has explained, a "tribe does not waive its sovereign immunity from actions that could not otherwise be brought against it merely because those actions were pleaded in a counterclaim." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991). The *only* exception is relief that "mirrors that requested by the Nation in its case in chief." *Cayuga Indian Nation of N.Y. v. Vill. of Union Springs*, 293 F. Supp. 2d 183, 195 (N.D.N.Y. 2003); *see Oneida Tribe of Indians of Wis. v. Vill. of Hobart*, 500 F. Supp. 2d 1143, 1149 (E.D. Wis. 2007) (sovereign immunity no bar where "relief sought by the Village in its request for declaratory relief is the mirror image of what the

Tribe seeks"). By seeking affirmative relief as to a specific claim, these courts have held, the Nation impliedly waived its immunity for an adverse "determination . . . on the same issue." *Vill. of Hobart*, 500 F. Supp. 2d at 1150.

Here, the County's requested relief does *not* mirror that sought by the Nation. There is a world of difference between seeking a determination of rights under specific federal and state statutes (as the Nation has done) and asking for a ruling on the Nation's reservation status in the abstract, disconnected from any specific right or dispute (as the County attempts). By initiating this action, the Nation consented to a determination of its reservation status *only* if necessary to resolve a live controversy concerning those specific federal and state statutes. It did not impliedly waive its sovereign immunity for the free-floating determination the County seeks.

*Second*, if the Court nonetheless determined that the County's counterclaim mirrored the Nation's affirmative claims, then the counterclaim would have to be dismissed as redundant. A counterclaim should be dismissed when it is "redundant" and "serves no independent purpose," but rather only is "the 'mirror image' of an opposing party's claim." *Worldwide Home Prods., Inc. v. Bed Bath & Beyond, Inc.*, No. 11 CIV. 03633 LTS, 2013 WL 247839, at *2 (S.D.N.Y. Jan. 22, 2013) (quoting *Arista Records LLC v. Usenet.com, Inc.*, No. 07 Civ. 8822, 2008 WL 4974823, at *3 (S.D.N.Y. Nov. 24, 2008)). Such duplicative counterclaims must be dismissed unless they "present[] an independent case or controversy that would survive a dismissal of the plaintiff's . . . claim." *Maverick Recording Co. v. Chowdhury*, No. CIVA CV07-640DGT, 2008 WL 3884350, at *2 (E.D.N.Y. Aug. 19, 2008) (citing *Larson v. General Motors Corp.*, 134 F.2d 450, 452 (2d Cir. 1943)); *see also Interscope Records v. Kimmel*, No. 07–CV–0108, 2007 WL 1756383, at *5 (N.D.N.Y. June 18, 2007).

Here, the County's counterclaim serves no independent purpose and could not survive independently of the Nation's claims. The Court may, as just noted, decide the status of the Nation's reservation in connection with the *Nation's* Non-Intercourse Act or state-law claims. But the *County's* counterclaim is not viable, for it requests an "advisory ruling[]" on an "abstract question"—not an "actual controversy." *Adirondack*, 871 F. Supp. 2d at 91 (internal quotation marks omitted). The Nation's affirmative claim potentially raises the reservation-status question in connection with specific and concrete disputes: whether the County's already-filed foreclosure proceedings are lawful under the Nonintercourse Act and New York state law. Am. Compl. ¶ 18. The County, however, simply seeks a declaration on the purported disestablishment of the Nation's resolution in the abstract, Answer at 7—disconnected from any request to resolve any specific "rights and . . . legal relations of any interested party." 28 U.S.C. § 2201(a). The County cannot use a declaratory judgment action to address that "abstract question." *Adirondack*, 871 F. Supp. 2d at 91; *see also Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 675 (2d Cir. 1996).

Hypothesizing a scenario in which the Nation's affirmative claims were dismissed confirms this point. *Maverick*, 2008 WL 3884350, at *2. The Nation here has declaratory-judgment standing based on the County's already-initiated foreclosure proceedings—an imminent "injury in fact" that results from the County's actions and that can be redressed by declaratory relief. Am. Compl. ¶ 12; *see, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003) (standing based on "realistic danger" of "direct injury" of enforcement). The County, however, faces no similar injury: If the Nation's affirmative claims were dismissed, the Nation would have *no way* to bring suit against or otherwise injure the County; instead, the

County's foreclosure proceeding would go forward. This just shows, yet again, that the County's counterclaim is not independently actionable. *See Arista Records LLC v. Usenet.com., Inc.*, No. 07 CIV. 8822 (HB), 2008 WL 4974823, at *3 (S.D.N.Y. Nov. 24, 2008) ("[N]o case or controversy existed in connection with the defendants' counterclaim" where "defendants faced no threat of future litigation" after the dismissal of plaintiff's claim); *Maverick*, 2008 WL 3884350 at *2 (similar); *Interscope*, 2007 WL 1756383, at *4 (no case or controversy because "[i]f Plaintiffs withdraw their claim, there is no continuing threat lingering over Defendant.").

The bottom line is that the County's counterclaim must be dismissed. If that counterclaim does not mirror the Nation's affirmative claims, then the Nation's sovereign immunity bars it. And if the counterclaim does mirror the Nation's claims, it is redundant. Either way, dismissal is required.[1]

## II. COLLATERAL ESTOPPEL FORECLOSES THE COUNTY'S DISESTABLISHMENT CLAIM

Even if the County's counterclaim were justiciable, it still should be dismissed. The County argues here that the Treaty of Buffalo Creek (possibly in conjunction with illegal land sales that preceded it) disestablished the Nation's reservation. Answer ¶¶ 32-36. The problem

---

[1] These twin rules do *not* preclude all counterclaims against Indian nations. A counterclaim may "mirror" the Indian nation's claims (and so avoid the sovereign-immunity bar), *Village of Hobart*, 500 F. Supp. 2d at 1149, but also "present an independent case or controversy" (and so avoid dismissal as duplicative), *Maverick*, 2008 WL 3884350, at *2. In *Village of Hobart*, for example, the tribe requested declaratory and injunctive relief seeking a refund of property taxes it claimed it had not been obligated to pay, and the Court held that the Village could "set off" its potential liability to the tribe based on other property taxes owed by the tribe to the Village. 500 F. Supp. at 1148. Such "set off" counterclaims "arise out of the same transaction or occurrence, seek the same kind of relief as the plaintiff, and do not seek an amount in excess of that sought by the plaintiff." *Berrey v. Asarco Inc.*, 439 F.3d 636, 643 (10th Cir. 2006). They thus simultaneously "mirror" the tribal plaintiff's claims (in the origin of the claim, the type of relief requested, and the amount of money sought), while presenting an independent case or controversy (because counterclaim would plainly satisfy Article III even if the plaintiff's original claim were dismissed). The County's problem here is that its counterclaim does not present an independently justiciable controversy.

for the County is that its officials have already litigated *and lost* the argument that the Nation's reservation no longer exists. The County is bound by that loss, and collateral estoppel forecloses the County from now relitigating it.[2]

**A. County Officials Litigated And Lost Their Disestablishment Argument In *Gould*.**

The *Gould* litigation in New York state court turned on precisely the disestablishment issue that the County's counterclaim seeks to raise. That case arose when Seneca County law enforcement officials claimed that the Nation had unlawfully failed to collect and remit sales taxes on cigarettes sold in two tribally operated convenience stores. *Cayuga Indian Nation of N.Y. v. Gould*, 930 N.E.2d 233, 240 (N.Y. 2010). The Nation disagreed, and it sued the County District Attorney and Sheriff in their official capacities, seeking a declaratory judgment that the Nation's conduct was lawful.[3] The Nation's position was that state law imposed no obligation to collect and remit such taxes on a "qualified reservation"; that the term "qualified reservation," a statutory term of art, incorporated the federal law definition of "reservation"; and that the Nation still had a "reservation" as a matter of federal law. *Id.* at 241; *see* Br. of Pl.-Appellee Cayuga Nation, *Gould* at 45-51, 930 N.E.2d 233 (N.Y. Jan. 22, 2010) (attached as Ex. A to the Decl. of Lee Alcott). The County disputed just this point, arguing that the Nation's conduct was unlawful on the ground that, *inter alia*, as a matter of federal law, the Nation's reservation supposedly no longer existed. *See, e.g.*, Reply Br. of Defts.-Appellants at 19, *Gould*, 930 N.E.2d 233 (N.Y.

---

[2] The Court may properly consider these collateral estoppel issues on a motion to dismiss. *See, e.g.*, *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000) ("Dismissal under Fed.R.Civ.P. 12(b)(6) is appropriate when a defendant raises claim preclusion or, as here, statutory waiver and bar as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."); *Maysonet v. Citi Grp., Inc.*, No. 10 Civ. 4616(SAS), 2011 WL 476610, at *1 n.4 (S.D.N.Y. Feb. 9, 2011) ("[W]hen a motion to dismiss is premised on the doctrine of collateral estoppel, a court is permitted to take judicial notice of and consider the complaints and the record generated in both actions without having to convert the motion to dismiss into a summary judgment motion." (quotation marks omitted; alteration in original)).

[3] The *Gould* defendants also included officials from Cayuga County. 930 N.E.2d at 240-41.

Feb. 9, 2010) ("[T]he Counties dispute the Nation's presumption that [its] federal reservation . . . has not been formally disestablished"); *id.* at 18 ("[I]t is respectfully submitted that the 1838 Treaty of Buffalo Creek, 7 Stat. 550, abolished any claims of the Nation and other Indian groups to any purported federal reservation.") (attached as Ex. B to the Decl. of Lee Alcott).

The Court of Appeals ruled for the Nation and rejected the County's argument that the Nation's reservation had been disestablished. Consistent with the Nation's position, the Court held that tribes selling cigarettes on "qualified reservation" property need not collect and remit tax. *See Gould*, 930 N.E.2d at 244. It further held that whether the Nation's properties were on a "qualified reservation" turned on whether they were "reservation property under federal law." *Id.* at 246; *see id.* (term "reservation" in statutory definition of "qualified reservation" refers to "reservation lands recognized by the federal government"). And importantly for present purposes, it held that the properties were indeed on a "qualified reservation," because the Nation's historic reservation still existed as a matter of federal law. *See id.* at 247.

In reaching that conclusion, the Court of Appeals considered and rejected the same argument raised in the County's counterclaim—that the combination of unlawful land sales in 1795 and 1807 and "the 1838 Treaty of Buffalo Creek disestablished . . . the Cayuga reservation." *Id.* at 247. The Court found it "well settled that only Congress has the power to disestablish or diminish a reservation." *Id.* at 246. It found no evidence that Congress had exercised that power with regard to the Nation's reservation. *Id.* In particular, the Court approved the Second Circuit's conclusion that the "'Treaty of Buffalo Creek neither mentions Cayuga land or Cayuga title in New York, nor refers to the 1795 or 1807 treaties' between New York and the Cayuga," *id.* at 247 (quoting *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 269 n.2 (2d Cir. 2005)), and similar conclusions by the Northern District of New York, *id.*

("Congress did not disestablish or diminish Cayuga reservation in Treaty of Buffalo Creek" (citing *Cayuga Indian Nation of N.Y. v. Village of Union Springs*, 317 F. Supp. 2d 128 (N.D.N.Y. 2004)); *id.* (the "1795 and 1807 conveyances of land to New York were invalid under Nonintercourse Act and were not approved by Congress in the Treaty of Buffalo Creek" (citing *Cayuga Indian Nation of N.Y. v. Cuomo*, 730 F. Supp. 485 (N.D.N.Y. 1990)).

Indeed, the Court of Appeals stressed that "*every federal court* that has examined whether the Cayuga reservation was disestablished or diminished by Congress has answered that question in the negative." *Gould*, 930 N.E.2d at 247 (emphasis added) (citing cases). This conclusion, the Court noted, was also consistent with the position of the federal government, which was on record as continuing to recognize the Nation's reservation. When the Nation purchased the convenience store parcels at issue in that case, the Bureau of Indian Affairs "identified the land in question as within the limits of the Cayuga reservation." *Id.* And in *Gould* itself, the United States submitted an amicus brief in which it stated that it "continues to recognize the existence of a Cayuga reservation in New York." *Id.*

The *Gould* defendants clearly recognized that the Court of Appeals had decided the reservation-disestablishment question against them: The County's petition for certiorari sought Supreme Court review of the Court of Appeals' holding that "the United States did not subsequently disestablish any purported federal reservation" that the Cayuga had possessed. Petition for Certiorari at i, *Gould v. Cayuga Indian Nation*, 562 U.S. 953 (2010) (No. 10-206) ("*Gould* Petition for Certiorari"), 2010 WL 3256353, at *i (questions presented); *see, e.g.*, *id.* at *27 (challenging "the Court of Appeals' conclusion that there is a federal Cayuga reservation which has not been disestablished") (attached as Ex. C to the Decl. of Lee Alcott). But the Court

denied the petition, and the Court of Appeals' *Gould* decision stood as the final word rejecting the County's disestablishment claim.

## B. Collateral Estoppel Precludes The County From Relitigating The Status Of The Nation's Reservation.

The County's attempt to reargue the disestablishment issue in its counterclaim is exactly what collateral estoppel forbids. That doctrine "prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002). It applies when:

> (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Id.* at 288-89 (quotation marks omitted). The doctrine recognizes that "once fairly tried, an issue resolved should not be [retried]," *Connecticut Gen. Life Ins. Co. of New York v. Cole*, 821 F. Supp. 193, 200 (S.D.N.Y. 1993) (bracket in original), and it protects "economy of judicial resources, finality, consistency and fairness," *Angstrohm Precision, Inc. v. Vishay Intertech., Inc.*, 567 F. Supp. 537, 539 (E.D.N.Y. 1982).

Collateral estoppel's requirements are plainly met here. The "identical issue . . . was raised" in *Gould*—whether the Nation's reservation continued to exist or instead had been disestablished. *Marvel*, 310 F.3d at 288-89 (quotation marks omitted); *see Gould*, 930 N.E.2d at 247. The parties "actually litigated" the issue and the Court "decide[d]" it on the merits. *Marvel*, 310 F.3d at 288-89; *see Gould*, 930 N.E.2d at 246-47. The "opportunity to litigate the issue" in *Gould* was as "full and fair" as it could be: Not only was the question taken to the New York Court of Appeals, but the defendants unsuccessfully petitioned the Supreme Court to intervene. *Gould*, 930 N.E.2d at 246-47. Finally, the "resolution of the issue was necessary to

support" the Court of Appeals' "final judgment on the merits." *Marvel*, 310 F.3d at 288-89 (emphasis added). As just explained, the Court's conclusion that the Nation acted lawfully in declining to tax cigarette sales turned *precisely* on whether the Nation's reservation still existed as a matter of federal law. *See Gould*, 930 N.E.2d at 246. Accordingly, the County is estopped from disputing that the Nation's reservation still exists.

It is irrelevant that *Gould* was an official-capacity suit against County officials while this case involves the County itself. Collateral estoppel applies not just to parties but also to "their privies." *Marvel*, 310 F.3d at 288. And government officials sued in their official capacities— like the defendants in *Gould*—are "generally considered to be in privity with the governmental entity that they serve." *Waldman v. Village of Kiryas Joel*, 39 F. Supp. 2d 370, 382 (S.D.N.Y. 1999), *aff'd*, 207 F.3d 105 (2d Cir. 2000); *see also Gray v. Lacke*, 885 F.2d 399, 405 (7th Cir. 1989) ("[I]n official-capacity suits, privity exists between governmental entities and their employees."); *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) ("governmental officials sued in their official capacities for actions taken in the course of their duties are considered in privity with the governmental body."). The conclusions in *Gould* are thus binding on the County.[4]

## III. BINDING PRECEDENT FORECLOSES THE COUNTY'S DISESTABLISHMENT CLAIM AS A MATTER OF LAW.

Even if collateral estoppel did not foreclose the County's disestablishment claim, that claim still would fail as a matter of law. Second Circuit precedent regarding the identically situated Oneida Nation squarely establishes that the Treaty of Buffalo Creek did not have the effect the County alleges; every court to have considered the County's argument regarding the

---

[4] Even if the County were to raise different arguments in support of its disestablishment theory than those considered in *Gould*, that effort would not defeat the application of collateral estoppel. As the Second Circuit has explained, "[c]ollateral estoppel does not turn upon a determination that . . . all possibly relevant arguments were made . . . but rather upon a recognition that an issue tendered for resolution in a later litigation has been finally determined in a prior adjudication." *Laaman v. United States*, 973 F.2d 107, 112 (2d Cir. 1992).

Cayuga Nation's reservation has rejected it; and the County's argument flies in the face of settled law that sets an extraordinarily high bar for claims that Congress has disestablished a reservation.

### A. Second Circuit Precedent Forecloses The County's Disestablishment Claim.

More than a decade ago, the Second Circuit squarely held that the Oneida Nation's reservation continued to exist after the Treaty of Buffalo Creek (and continues to exist today). *Oneida Indian Nation of N.Y. v. City of Sherrill*, 337 F.3d 139, 166 (2d Cir. 2003), *rev'd*, 544 U.S. 197 (2005). That precedent is controlling for the Cayuga Nation's identically situated reservation.

In the *Oneida Indian Nation* decision, the Second Circuit comprehensively reviewed the historical record to conclude that, as a matter of law, the Treaty of Buffalo Creek did not disestablish the Oneida Nation's reservation. The governing standard, the Court emphasized, is a stringent one: "Once a block of land is set aside for an Indian reservation . . . the entire block retains its reservation status until Congress explicitly indicates otherwise." *Id.* at 156-57 (emphasis added) (quoting *Solem v. Bartlett*, 465 U.S. 463, 471 (1984)); *see also id.* at 159-60. Applying that standard, the Court exhaustively considered the establishment of a federal reservation in the Treaty of Canandaigua (to which the Cayuga Nation was also a party); the subsequent series of unlawful land sales that resulted in the loss of the Oneida's reservation lands (as with the Cayuga Nation's lands); and the text and context of the Buffalo Creek treaty itself (to which, again, the Cayuga Nation was also a party). After all of that analysis, the Court held that "[n]othing in [the Treaty's] text provides 'substantial and compelling' evidence of Congress's intention to diminish or disestablish the Oneidas' New York reservation." *Id.* at 161.

That decision remains the controlling law of the Circuit. The Second Circuit's original decision was vacated and reversed by the Supreme Court in *City of Sherrill*, which held that the equitable doctrines of laches and acquiescence barred the Oneida Nation from reasserting

sovereignty over its reservation. *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 221 (2005). But *City of Sherrill* did not disturb the Second Circuit's holding that the *reservation itself* continues to exist. *See Oneida Indian Nation of N.Y. v. Madison Cnty.*, 605 F.3d 149, 157 n.6 (2d Cir. 2010) (explaining that the Supreme Court "explicitly declined to resolve the question of whether the Oneida reservation had been 'disestablished'"), *vacated as moot*, 562 U.S. 42 (2011). Indeed, the Second Circuit has expressly held that, notwithstanding *City of Sherrill*, its prior reservation-disestablishment decision "remains the controlling law of this circuit." *Id.*

The Second Circuit's *Oneida Indian Nation* decision is equally controlling as to the Cayuga Nation's reservation. The relevant facts are indistinguishable: Both the Cayuga and the Oneida received a federal reservation via the Treaty of Canandaigua; lost their reservation lands through illegal sales; and were parties to the Treaty of Buffalo Creek. *See City of Sherrill*, 337 F.3d at 146-50 (Oneida); *Union Springs*, 317 F. Supp 2d at 137-43 (Cayuga); *Cuomo*, 730 F. Supp. at 488-93 (same). There is simply no basis for distinguishing the Cayuga Nation's reservation from the Oneida's—and courts have refused to draw such a line. *See Cayuga Indian Nation of N.Y. v. Vill. of Union Springs*, 390 F. Supp. 2d 203, 206 (N.D.N.Y. 2005) (applying *City of Sherrill* to Cayuga reservation lands). The County's counterclaim thus fails as a matter of settled precedent.

## B. The Treaty Of Buffalo Creek Did Not Disestablish The Cayuga Nation's Reservation, As Courts Have Unanimously Held.

Even discounting everything above—the New York Court of Appeals' preclusive *Gould* decision, and the Second Circuit's squarely controlling *Oneida Indian Nation* decision—the County's disestablishment counterclaim still fails as a matter of law. The controlling law is clear that the Nation's reservation remains intact, and that the Treaty of Buffalo Creek did not disestablish it.

The conclusion that the reservation remains intact has been reached not just by the New York Court of Appeals, as noted above, but by "every federal court" to consider the question. *Gould*, 930 N.E.2d at 247; *Union Springs*, 317 F. Supp. 2d at 137 (explaining that because Congress has never disestablished the Cayuga Nation's reservation, "the reservation status of that land remains in place to this day"); *see also Cayuga Indian Nation of N.Y. v. Cuomo*, 758 F. Supp. 107, 115 (N.D.N.Y. 1991); *Cuomo*, 730 F. Supp. at 493. That, too, is the position of the United States government. It expressly reiterated that position in *Gould*. *See supra* at ##. And the Bureau of Indian Affairs—the federal agency with jurisdiction over Indian affairs—is processing the Nation's application to have land taken into trust pursuant to 25 U.S.C. § 177 under the special track dedicated to "on-reservation acquisitions." *See* 25 C.F.R. § 151.10; *Gould*, 930 N.E.2d at 247.

Given the legal standard and the undisputed facts, this unanimous consensus is plainly correct. The Treaty of Canandaigua established a federal reservation for the Cayuga. *See, e.g.*, *Union Springs*, 317 F. Supp. 2d at 132 (citing cases). And once a federal reservation exists, the settled rule is that "only Congress can alter the terms of an Indian treaty by diminishing a reservation." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998); *see City of Sherrill*, 544 U.S. at 215 n.9 ("The Court has recognized that 'only Congress can divest a reservation of its land and diminish its boundaries.'" (quoting *Solem*, 465 U.S. at 470)). Such disestablishment, moreover, "will not be lightly inferred," *Solem v. Bartlett*, 465 U.S. 463, 470 (1984); to the contrary, Congress's mandate must be "clear," "explicit[]," and "clearly evince an intent" to remove protection "from the reservation," *id.* Accordingly, the Supreme Court has never found a reservation to be disestablished or diminished without an explicit expression of congressional purpose to that effect. *See*, *e.g.*, *Yankton Sioux Tribe*, 522 U.S. at 351 ("explicit

language" of statute indicates intent to diminish reservation); *Hagen v. Utah*, 510 U.S. 399, 420 (1994) ("textual and contemporaneous evidence of diminishment is clear"); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 597 (1977) (statutory language "precisely suited" to disestablishment (quotation marks omitted)); *DeCoteau v. Dist. Cnty. Ct. for Tenth Judicial Dist.*, 420 U.S. 425, 445 (1975) (statute "point[s] unmistakably" to termination).

As a matter of law, the County's disestablishment claim plainly cannot meet this stringent standard. The County points, first, to two unlawful land sales to the State of New York in 1795 and 1807. Answer ¶¶ 32-33. But these acts cannot possibly have disestablished the Cayuga Nation's reservation because, as just noted, only Congress—not a state—can do so. *See, e.g.*, *Yankton Sioux*, 522 U.S. at 343. And this is true "no matter what happens to the title of individual plots within the area." *Solem*, 465 U.S. at 470; *see Union Springs*, 317 F. Supp. 2d at 132 (explaining that the "1795 and 1807 . . . conveyances were never ratified by the United States"); *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 269 n.2 (2d Cir. 2005) (stressing that the Treaty of Buffalo Creek does not "refer[] to the 1795 or 1807 treaties").[5]

The County's reliance on the Treaty of Buffalo Creek is equally unavailing. Answer ¶¶ 34-35. The "central bargain" of that treaty was not about New York lands at all; rather, it was "the cession of the New York Indians' Wisconsin lands in exchange for reservation land in Kansas." *City of Sherrill*, 337 F.3d at 160. Indeed, as the Second Circuit has observed, the

---

[5] Indeed, even where Congress has *approved* the sale in question, a land sale does not terminate the land's reservation status. *DeCoteau*, 420 U.S. at 444; *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 356-59 (2010); *Mattz v. Arnett*, 412 U.S. 481, 504 (1973). And that rule applies with even greater force where Congress has *prohibited* such sales, as it did here when it enacted the Non-Intercourse Act and forbade land transactions with Indian nations unless ratified by the United States. 1 Stat. 137 (1790), *codified as amended*, 25 U.S.C. § 177. New York's purchases of Cayuga land were never so ratified. *See Pataki*, 413 F.3d at 269; *see also Oneida County v. Oneida Indian Nation of New York*, 470 U.S. 226, 232 (1985) (describing the purchase of Indian land by New York as inconsistent with "Congress' clear policy" as expressed in the Non-Intercourse Act).

treaty nowhere even "mention[ed] Cayuga land or Cayuga title in New York." *Pataki*, 413 F.3d at 269 n.2. Instead, the treaty merely provided that the Cayugas would receive Kansas lands *if* "the[y] remov[ed] to . . . new homes at the west." Treaty of Buffalo Creek, art. 11, Jan. 15, 1838, 7 Stat. 550. Indeed, the treaty expressly contemplated that the Cayugas might *not* "accept and agree to remove to the country set apart for" them in Kansas. *Id.* art. 3. That is, as the Second Circuit observed with respect to the Oneida, the treaty merely reflected "a simple agreement to agree"—and recognized that such agreement might not occur. *City of Sherrill*, 337 F.3d at 161-62. The absence of any congressional intention to disestablish the Cayugas' reservation is especially plain in light of the separate provisions covering the Senecas and the Tuscaroras, which *did* "contain explicit cession language" for these tribes' New York territories. *Id.* Without even an express reference to Cayuga lands in New York, the Treaty of Buffalo Creek plainly cannot meet the stringent standard for disestablishment under the Supreme Court's cases.

## CONCLUSION

For the foregoing reasons, the Nation respectfully requests that its motion to dismiss the County's counterclaim be granted.

Dated:  October 8, 2015

Respectfully submitted,

 /s/  Lee Alcott

Daniel J. French
Lee Alcott
FRENCH-ALCOTT, PLLC
300 South State Street, 9th Floor
Syracuse, New York 13202
(315) 413-4050