UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CAYUGA INDIAN NATION OF NEW YORK,

                                    Plaintiff,

                -v-                                           DECISION AND ORDER

SENECA COUNTY, NEW YORK,                          11-CV-6004 CJS

                                    Defendant.

_____

APPEARANCES

For Plaintiff:              Daniel J. French, Esq.
                            Lee Alcott, Esq.
                            French-Alcott, PLLC
                            300 South State Street
                            Syracuse, New York 13202


For Defendant:              Brian Laudadio, Esq.
                            Louis P. DiLorenzo, Esq.
                            Mary P. Moore, Esq.
                            Bond Schoeneck & King PLLC
                            530 Linden Oaks, Suite 310
                            Rochester, New York 14625


INTRODUCTION

    This action challenges Seneca County's ability to impose and collect *ad valorem* property taxes on parcels of real estate owned by the Cayuga Indian Nation of New York.  The Cayuga Nation contends both that Seneca County cannot impose the property taxes, because the subject properties are "located within an Indian

reservation,"[1] and cannot sue to collect the taxes, because the Cayuga Indian Nation enjoys sovereign immunity from suit.[2]  Now before the Court is the Cayuga Nation's motion (Docket No. [#39]) to dismiss Seneca County's counterclaim, which seeks a declaratory judgment that the subject properties, which the Cayugas ostensibly sold two centuries ago and then recently re-purchased, "are not now an Indian reservation for purposes of New York Real Property Tax Law § 454 or Indian Law § 6 or [']Indian Country['] for purposes of 18 U.S.C. § 1151."  The application is granted.

## BACKGROUND

Unless otherwise indicated, the following facts are taken from Seneca County's "Answer to Amended Complaint and Counterclaim,"[3] and are presumed to be true for purposes of this Decision and Order. In February 1789, the Cayuga Nation and the State of New York signed a treaty, which, among other things, established a 64,000-acre Cayuga Indian Reservation.  Between 1795 and 1807, the Cayuga Nation sold all of the Cayuga Indian Reservation lands to the State of New York.  The State of New York subsequently sold those lands to private third parties.  In 1838, the United States and the Cayuga Indians entered into the Treaty of Buffalo Creek, which, Seneca County maintains, disestablished any remaining Cayuga Reservation in New York.  In recent years, the Cayuga Nation purchased at least five parcels of land in Seneca County,

---

[1] Amended Complaint [#9] at ¶ 1.
[2] This Court has already granted a preliminary injunction, agreeing with the latter proposition.
[3] *See, Gottlieb, Rackman & Reisman, P.C. v. ZenColor Corp.*, No. 13 CV. 5715 JGK, 2015 WL 4206982, at *1 (S.D.N.Y. July 10, 2015) ("When presented with a motion to dismiss pursuant to Rule 12(b) (6), the Court may consider documents that are referenced in the counterclaims, documents that the pleader relied on in bringing suit and that are in the pleader's possession or that the pleader knew of when bringing suit, and matters of which judicial notice may be taken.") (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002).

within the same geographic area as the Cayuga Indian Reservation that was established in 1789. Seneca County imposed property taxes on the Cayuga-owned properties, but the Cayuga Nation refused to pay the taxes. Thereafter, Seneca County initiated tax foreclosure proceedings against the Cayuga Nation.

In response to those foreclosure lawsuits, the Cayuga Nation commenced this lawsuit. The Cayugas' Amended Complaint purports to assert two causes of action. The first cause of action alleges that the County's attempts to foreclose on the Cayugas' properties violate federal law, and specifically, the Treaty of Canandaigua, the U.S. Constitution Article I, § 8, and the "Non-Intercourse Act," 25 U.S.C. § 177. On this point, the Cayugas' pleading alleges that any properties which the Cayugas own in Seneca County are within the geographic boundary of the 64,000-acre Cayuga Indian Reservation that was "acknowledged [by the United States of America] in the Treaty of Canandaigua, November 11, 1794."[4] The Amended Complaint contends that, while the Cayuga Nation purportedly sold all of that 64,000-acre reservation to the State of New York, such sales were *void ab initio*, since they were never approved by Congress as required by the Non-Intercourse Act.[5] Consequently, the pleading asserts, "the Nation's 64,000-acre reservation continues to exist to this day," and the subject properties are "'Indian Country' within the meaning of 18 U.S.C. § 1151."[6] Alternatively, the Cayugas contend that regardless of the reservation status of the subject land, the Cayuga Nation possesses "tribal sovereign immunity, which bars administrative and judicial

---

[4] Amended Complaint [#9] at ¶ 7.
[5] *See*, Amended Complaint [#9] at ¶ 9 ("All of those transactions and transfers were in violation of federal law and were *void ab initio*, and the Nation never lost its aboriginal title[.]").
[6] Amended Complaint [#9] at ¶ 8. 18 U.S.C. § 1151 defines "indian country," in pertinent part, as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government."

proceedings against the Nation and bars Seneca County from taking any assets of the Nation."[7]

In sum, the Cayugas' first cause of action is twofold: 1) the subject properties are part of the federally-recognized Cayuga Indian Reservation, and the County therefore cannot foreclose on the properties, because it lacks the authority to interfere with the ownership or possession of federal Indian reservation lands; and 2) the "Cayuga Indian Nation of New York" is a "sovereign Indian nation," which is protected from foreclosure lawsuits by the federal doctrine of sovereign immunity from suit.[8]

The Cayugas' second cause of action alleges that Seneca County violated two New York statutes -- New York State Property Tax Law § 454 and New York Indian Law § 6 -- by assessing property taxes on their properties. On this point, the pleading contends that both of those statutes forbid the imposition of taxes on "Indian reservation" lands. See, Amended Complaint [#9] at ¶ ¶ 21-22 ("New York [Real Property Tax Law § 454] provides that 'real property in any Indian reservation owned by the Indian nation, tribe or band occupying them shall be exempt from taxation[, while] New York Indian Law § 6 directs that no taxes shall be established upon Indian Reservation lands. . . . Pursuant to the aforesaid provision[ ] of state law, taxes should not have been assessed against the Nation-owned properties[.]").

As for relief, the Cayugas' pleading seeks two types. First, the Amended Complaint seeks a declaration that the County cannot foreclose on, or otherwise "acquire, convey, sell or transfer title" to, "Nation-owned properties" within Seneca

_____

[7]Amended Complaint [#9] at ¶ 17.
[8] Amended Complaint [#9] at ¶ 20; *see also, id.* at ¶ 18(d) (referring to "the Nation's sovereign immunity, which derives from Article I, Section 8 of the United States Constitution and from federal common law[.]").

County. Second, the Amended Complaint seeks an injunction, prohibiting the County from making "any further efforts" to foreclose on, acquire, convey or otherwise sell "Nation-owned properties in Seneca County;" prohibiting the County from "interfering in any way with the Nation's ownership, possession, and occupancy of such lands;" and requiring the County to "rescind all acts taken to acquire, convey, foreclose, sell or transfer title to Nation-owned properties within Seneca County to date."

When the Cayugas commenced this action, they also filed a motion for preliminary injunctive relief, barring Seneca County from proceeding with pending foreclosure actions, affecting the five parcels identified in the Amended Complaint, on the basis of sovereign immunity. On August 20, 2012, the Court granted such preliminary injunctive relief. *Cayuga Indian Nation of New York v. Seneca County, New York*, 890 F.Supp.2d 240 (W.D.N.Y. 2012). Seneca County appealed, but on July 31, 2014, the United States Court of Appeals for the Second Circuit affirmed this Court's ruling, agreeing that the Cayuga Indian Nation has sovereign immunity from suit. *Cayuga Indian Nation of New York v. Seneca County, New York*, 761 F.3d 218 (2d Cir. 2014).

On August 31, 2015, Seneca County filed its Answer to Amended Complaint and Counterclaim [#37]. The counterclaim seeks a declaratory judgment "that the Subject Properties are not now an Indian reservation for purposes of New York Real Property Tax Law § 454 or Indian Law § 6 or Indian country for purposes of 18 U.S.C. § 1151." The pertinent factual allegations supporting the counterclaim are as follows:

> On or about July 27, 1795, the Nation entered into a treaty with the State of New York under which New York acquired the entire "Original Reservation," except for a three-square mile parcel. In 1807, the State of

> New York purchased the remaining three-square mile parcel . . . from the Nation. The Treaty of Buffalo Creek of 1838 was ratified by the Senate and proclaimed by the President of the United States. *The Treaty of Buffalo Creek of 1838 disestablished any Nation reservation in New York.* As a result of the foregoing, any and all right, title, and interest of the Nation to the "Original Reservation" had lawfully extinguished and the State of New York held full title to these lands[, which they later sold to ] private successors in interest. . . . The subsequent history and treatment of the land located within what had been the "Original Reservation" demonstrate and confirm that the former Nation reservation was disestablished long ago.

Answer to Amended Complaint with Counterclaim [#37] at ¶ ¶ 32-37, 39 (emphasis added; paragraph numbers omitted). Thus, Seneca County's contention that the Cayuga Indian Reservation does not presently exist has two primary components: First, that the reservation was disestablished by the Treaty of Buffalo Creek; and second, that such disestablishment has been "demonstrated and confirmed" by the "subsequent history and treatment of the land."[9] The counterclaim seeks the dismissal of the Amended Complaint, and a declaration that "the former Nation reservation has been disestablished as to the subject lands and that the lands that were formerly the "Original Reservation" are neither "Indian country" nor part of an "Indian reservation[.]"

On October 8, 2015, the Cayuga Nation filed the subject motion [#39] to dismiss the counterclaim. The Nation first contends that the counterclaim is "non-justiciable" because it is barred by sovereign immunity. In particular, the Nation asserts that by bringing this action, it "did not expressly or impliedly consent to an adjudication of its reservation status in the abstract."[10] The Nation admits that there is an exception to

---

[9]As will be seen below, these allegations track the factors which federal courts apply when determining whether Congress has disestablished a federal Indian reservation.
[10]Motion to Dismiss, Memo [#39-1] at p. 1.

sovereign immunity, which permits a counterclaim that "mirrors" the sovereign's claim, but contends that Seneca County's counterclaim does not mirror the Nation's claim. Further, the Nation contends that to the extent that the counterclaim mirrors the Nation's claim, it is still non-justiciable because the counterclaim is redundant of the Nation's claim, and does not present an independent case or controversy.

As a second basis for dismissal, the Nation contends that the counterclaim is barred by collateral estoppel. In particular, the Nation contends that the Seneca County Sheriff and Seneca County District Attorney unsuccessfully litigated the same argument that Seneca County is raising here – that the Cayuga Reservation was disestablished by the Treaty of Buffalo Creek – in *Cayuga Indian Nation of New York v. Gould*, 14 N.Y.3d 614, 930 N.E.2d 233 ("*Gould*"), cert den., 562 U.S. 953 (2010). The Nation contends that because the Seneca County Sheriff and Seneca County District Attorney were sued in their official capacities in *Gould*, they are in sufficient privity with Seneca County, such that collateral estoppel should apply to the County in this action.

As the third and last basis for its motion to dismiss the counterclaim, the Nation contends that the counterclaim fails to state an actionable claim as a matter of law, since "binding precedent" and other Second Circuit case law establishes that the Cayuga Reservation still exists. In particular, the Nation contends that the Second Circuit Court of Appeals has determined that the similarly-situated Oneida Indian Reservation continues to exist, and was not disestablished by the Treaty of Buffalo Creek, citing, *inter alia*, *Oneida Indian Nation of New York v. City of Sherrill, New York*, 337 F.3d 139 (2d Cir. 2003), reversed and remanded, 544 U.S. 197, 125 S. Ct. 1478 (2005) and *Oneida Indian Nation of N.Y. v. Madison County*, 605 F.3d 149, 157 n. 6 (2d

Cir. 2010), vacated as moot, 562 U.S. 42 (2011).

The Cayuga Nation's motion to dismiss is purportedly made pursuant to both Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). It appears that the "justiciability" arguments (sovereign immunity and lack of independent case or controversy) are made under Rule 12(b)(1), while the collateral estoppel and merits-based arguments are made under Rule 12(b)(6).

Seneca County opposes every aspect of the Cayuga Nation's motion to dismiss. Seneca County first contends that the counterclaim is justiciable, because the counterclaim is the "mirror" of the Cayugas' claim and therefore is not barred by sovereign immunity, and because the counterclaim involves an independent case or controversy, namely, whether the County can impose taxes on Nation-owned properties. The County further contends that collateral estoppel does not apply to the counterclaim, because there is no privity between Seneca County and the County Sheriff and District Attorney who were sued in *Gould*; because the relevant issue in *Gould* was an issue of law, to which collateral estoppel does not apply; and because the issue in *Gould* was different inasmuch as it involved a different statute (New York Tax Law § 470(16)(a)) than the ones involved in this lawsuit. Finally, the County contends that the counterclaim has merit, and is not foreclosed by the case precedent upon which the Cayuga Nation relies. For example, the County contends that the Second Circuit's decisions cited by the Cayugas involved the Oneida Indian Nation, not the Cayuga Nation, and that the two nations are not similarly situated. Further, the County urges this Court not to follow district court decisions which have found that the Cayuga Reservation still exists.

The Cayuga Nation filed a reply in which it reiterates the arguments in its motion to dismiss. Additionally, with regard to collateral estoppel, the Cayugas' reply raises a new argument, namely, that Seneca County should be deemed to be in privity with the county officials who were involved in the *Gould* lawsuit, because Seneca County funded and controlled the legal defense for those county officials. As for the merits of the counterclaim, the Cayugas maintain that the counterclaim fails to plausibly plead how the Cayuga Reservation was disestablished.

On June 15, 2016, the Cayuga Nation submitted a supplemental letter brief, concerning the Supreme Court's then-recent decision in *Nebraska v. Parker*, 136 S.Ct. 1072, 2016 WL 1092417 (2016) ("*Parker*"), which involved an analysis of whether Congress had disestablished an Omaha Indian reservation in Nebraska. The Cayugas argue that *Parker* supports their contention that the counterclaim lacks merit. Seneca County responds that *Parker* is factually inapposite.

The Court indicated, prior to briefing on the motion to dismiss the counterclaim, that it would only schedule oral argument if necessary. (Docket No. [#36]). The Court has determined that oral argument is not necessary.

## STANDARDS OF LAW

Where the Court has before it motions under both 12(b)(1) and 12(b)(6), it should address the 12(b)(1) motion first. *See, Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) ("[T]he court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.") (citations and internal quotation marks omitted).

<u>FRCP 12(b)(1) : Sovereign Immunity and Case or Controversy Requirement</u>[11]

 "A complaint must be dismissed under Rule 12(b)(1) 'when the district court lacks the statutory or constitutional power to adjudicate' the case." *McMillan v. N.Y. State Bd. of Elections*, 449 F. App'x 79, 80 (2d Cir. 2011) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000)).  The standard to be applied on such a motion is as follows:

> In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction.  But where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.  In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citations and internal quotation marks omitted).

---

[11]The "case or controversy" aspect of the Cayuga Nation's motion clearly involves the Court's jurisdiction, and is therefore properly considered under FRCP 12(b)(1). *See, Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016) ("Article III of the United States Constitution limits the jurisdiction of federal courts to 'Cases' or 'Controversies.' U.S. Const. art. III, § 2.").  However, there is some dispute among courts as to whether a motion to dismiss based on sovereign immunity falls under FRCP 12(b)(1) or 12(b)(6). *See, Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013), as corrected (Sept. 27, 2013) ("[W]hether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit.  More recently, we held that the burden of proof in a case involving the assertion of sovereign immunity is on the party asserting it—a holding that we acknowledged is more consistent with the understanding that sovereign immunity was an affirmative defense.") (citations omitted).  Despite the absence of definitive ruling on this point, the trend among courts in this Circuit appears to warrant treating sovereign immunity as an affirmative defense. *See, e.g., Aerotrade, Inc. v. Republic of Haiti, 376 F. Supp. 1281, 1283 (S.D.N.Y. 1974)* ("The plea of sovereign immunity constitutes an affirmative defense, and as such, defendant's motion may be considered under Rule 12(b)(6) of the Federal Rules of Civil Procedure as one for dismissal of the complaint for failure to state a claim for relief.") (Weinfeld, J.) (citations omitted).  Here, though, the distinction between the two rules is immaterial because in resolving the sovereign immunity issue the Court considers only the pleadings, the law and matters of which the Court may take judicial notice. *See, McMillan v. N.Y. State Bd. of Elections*, No. 10-CV-2502 JG VVP, 2010 WL 4065434, at *3 (E.D.N.Y. Oct. 15, 2010) ("This distinction [between FRCP 12(b)(1) and FRCP 12(b)(6)] does not affect the outcome here; in evaluating the State Board's assertion of sovereign immunity, I look only to the pleadings and to state and federal law."), *aff'd*, 449 F. App'x 79 (2d Cir. 2011).

<u>The Counterclaim is Not Barred by Sovereign Immunity, and
Involves an Actual Case or Controversy</u>

The Cayuga Nation contends that the County's counterclaim is barred by sovereign immunity from suit. On this point, the Cayugas argue that their sovereign immunity bars a counterclaim that seeks "anything beyond the 'mirror image' of the Nation's affirmative claims," which, they maintain, the County's counterclaim does. Alternatively, the Cayugas contend that if the counterclaim "mirrors" their own claim for relief, then it fails to state an independent case or controversy, since the County would face no injury if the Cayugas discontinued this action. Seneca County responds that its counterclaim "mirrors" the Cayugas' claim, and that the Cayugas waived sovereign immunity on this issue by raising it in the Amended Complaint.[12] Seneca County further argues that the counterclaim is independently justiciable, and presents an actual case or controversy, because the Cayugas continue to refuse to pay their property taxes to the County, based on their contention that the subject property is part of the Cayuga Reservation.

The Court has already determined that the Cayuga Nation cannot be sued in the underlying foreclosure actions, because it enjoys sovereign immunity from suit. In that regard, the Court pointed out that an Indian tribe generally cannot be sued unless it consents to be sued, or unless Congress authorizes the lawsuit. "This principle extends to counterclaims lodged against a plaintiff tribe—even compulsory counterclaims." *Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1009 (10th Cir. 2015) (*citing Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505,

---

[12]*See*, Def. Memo of Law [#40] at p. 7 ("[T]he Nation put the status of its purported reservation . . . at issue by bringing its claims.").

509–10, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991)[13]).  Since there is no suggestion that Congress authorized Seneca County's counterclaim, the issue is whether the Cayuga Nation waived its sovereign immunity as to the counterclaim, by bringing this action.

The U.S. Supreme Court has held that an Indian tribe does "not waive its sovereign immunity" as to counterclaims "merely by filing an action for injunctive relief." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. at 510, 111 S. Ct. at 909.  However, where an Indian tribe seeks a declaration that a particular fact is true, *e.g.*, that its reservation still exists, it necessarily waives its sovereign immunity as to a counterclaim seeking the exact opposite declaration.  That is, the Indian tribe has agreed to be bound by the court's determination of the question that the tribe has presented, whether or not it is favorable to the tribe. *See, Tohono O'odham Nation v. Ducey*, 174 F. Supp. 3d 1194, 1204 (D. Ariz. 2016) ("Having placed a question before the court, a sovereign acknowledges the court's authority to resolve that question, whether in favor of the sovereign or in favor of a counterclaimant seeking the opposite resolution.") (citations omitted); *see also, Rupp v. Omaha Indian Tribe*, 45 F.3d 1241, 1245 (8th Cir. 1995) ("We will not transmogrify the doctrine of tribal immunity into one which dictates that the tribe never loses a lawsuit.  When the Tribe filed this suit, it consented to and assumed the risk of the court determining that the Tribe did not have title to the disputed tracts.") (citation omitted); *McClendon v. United States*, 885 F.2d 627, 630 (9th Cir. 1989) ("Initiation of a lawsuit necessarily establishes consent to the court's adjudication of the merits of that particular controversy.").

---

[13]The Supreme Court's statement on this point is unequivocal: "Possessing immunity from direct suit, we are of the opinion the Indian nations possess a similar immunity from cross-suits." *Id.*, 498 U.S. at 509, 111 S. Ct. at 909 (citation and internal quotation marks omitted).

The Cayuga Nation concedes that mirror-image counterclaims are *not* precluded by sovereign immunity.[14] Nevertheless, the Cayugas maintain that their claims are not the mirror image of the counterclaim, since their claim makes specific reference to particular statutes, while the counterclaim seeks a determination of the Cayuga reservation's status "in the abstract, disconnected from any specific right or dispute."[15] The Cayuga Nation contends that because the counterclaim is not a "mirror image," it is barred by sovereign immunity.

However, the Court disagrees, and finds that the counterclaim is the "mirror image" of the Cayugas' claim. In particular, the counterclaim seeks a declaration that the Cayuga-owned properties in Seneca County "are not now an Indian reservation for purposes of New York Real Property Tax Law § 454 or Indian Law § 6 or Indian Country for purposes of 18 U.S.C. § 1151,"[16] because the reservation was disestablished. This position is precisely the opposite of what the Cayuga Nation contends in the Amended Complaint. In that regard, the Amended Complaint [#9] alleges, *inter alia*, that the Cayuga Reservation was never disestablished, and therefore cannot be taxed by Seneca County because it is "'Indian country' within the meaning of 18 U.S.C. § 1151" (¶ 8) and an "Indian reservation" as described in NYRPTL § 454 and Indian Law § 6 (¶ 21). The Court concludes that the Cayuga Nation has thus waived its sovereign immunity as to the counterclaim, and its motion to dismiss the counterclaim is denied insofar as it is based upon sovereign immunity.

---

[14]*See*, Pl. Memo of Law [#39-1] at p. 1 ("[I]f the County's counterclaim seeks anything *beyond* the 'mirror image' of the Nation's affirmative claims, the Nation's sovereign immunity would preclude it.") (emphasis in original); *see also, id.*, at p. 4 (Admitting that such mirror- image counterclaims are not barred by *Oklahoma Tax Commission*.)

[15]Pl. Memo of Law [#39-1] at . 5.

[16]Answer with Counterclaim [#37] at ¶ 25.

The Cayugas nevertheless contend, alternatively, that if the counterclaim mirrors the claims in the Amended Complaint, then the Court lacks subject-matter jurisdiction to consider the counterclaim, since the counterclaim fails to present an independent case or controversy. On this point, the Cayugas cite, *inter alia*, *Arista Records LLC v. Usenet.com, Inc.*, No. 07 Civ. 8822(HB), 2008 WL 4974823 (S.D.N.Y. Nov. 24, 2008) and *Maverick Recording Co. v. Chowdhury*, Nos. 07 Civ. 200 & 07 Civ. 640, 2008 WL 3884350 (E.D.N.Y. Aug. 19, 2008), for the proposition that claims must be dismissed where they are "redundant" and "serve[ ] no independent purpose, but [are] rather only . . . the 'mirror image' of [the] opposing party's claim." The Cayugas maintain that the counterclaim is merely a "mirror image," since, if the Tribe's claims were discontinued, there would no longer be any dispute between the Cayuga Nation and Seneca County. Further, the Cayugas maintain that the counterclaim seeks "a ruling on the Nation's reservation status in the abstract, disconnected from any specific right or dispute," and therefore is not the proper subject of a declaratory judgment action.

However, the Court again disagrees. To begin with, it is clear from the pleadings that there is a real, not speculative, ongoing disagreement between the parties as to whether the Nation-owned properties are taxable, because they are Indian-reservation lands, regardless of whether the County is presently able to collect any taxes imposed.[17] Even if the Cayuga Nation discontinued its lawsuit, there is every indication that the Cayuga Nation will continue to own real estate in Seneca County, and that the County will continue to impose property taxes annually on such lands, unless it is demonstrated that such lands cannot be taxed. The Cayuga Nation contends that its

---

[17]Congress could always enact legislation allowing the County to sue to collect the taxes, or the Cayuga Nation could agree to pay the taxes.

lands should not be taxed, pursuant to RPTL § 454, Indian Law § 6 and 18 U.S.C. § 1151, and the County disagrees. Consequently, under the totality of the circumstances[18] presented, the Court finds that the counterclaim presents an independent case or controversy.

For the same reason, the Court does not agree with the Cayuga Nation that the counterclaim merely raises an "abstract question."[19] On this issue, the legal standard is as follows:

> The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941). The Court finds that there is a substantial controversy between the parties, concerning the County's ability to tax the Nation's lands, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. For all of these reasons, the Court finds that the Cayuga Nation's arguments concerning the "justiciability" of the counterclaim lack merit.

---

[18]*See, Nike, Inc. v. Already, LLC*, 663 F.3d 89, 95 (2d Cir. 2011), *aff'd*, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013) ("[I]n *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) . . . the Supreme Court endorsed a totality of the circumstances test for determining whether a party seeking relief under the Act has demonstrated that a justiciable 'controversy' exists.").
[19]Pl. Memo of Law [#39-1] at p. 1.

<u>Collateral Estoppel</u>

Seneca County's counterclaim contends that the subject Nation-owned properties in Seneca County are "neither 'Indian country' nor part of an 'Indian reservation,'" because, after the Cayuga Nation sold all of its lands to the State of New York, "[t]he Treaty of Buffalo Creek of 1838 disestablished any [Cayuga] Nation reservation in New York."[20]  This contention is the basis for the counterclaim's assertion that "the subject properties are not now an Indian reservation for purposes of [RPTL] § 454 or Indian Law § 6 or Indian country for purposes of 18 U.S.C. § 1151."[21]   The Cayuga Nation counters that this claim is barred by collateral estoppel, because in *Gould*, the New York Court of Appeals specifically held that the Treaty of Buffalo Creek did *not* disestablish the Cayuga Reservation.  The Cayuga Nation argues that while Seneca County was not actually a party in *Gould*, it is nonetheless bound by *Gould*, since the Seneca County Sheriff and Seneca County District Attorney, who were defendants in *Gould*, are in privity with the County, inasmuch as the Sheriff and District Attorney were sued in their official capacities.[22]   The County denies that it is in privity

---

[20]Answer with Counterclaim [#37] at ¶ 35; *see also, id*. at pp. 6-7.

[21]Answer with Counterclaim [#37] at ¶ 25.

[22]As noted earlier, the Cayuga Nation's reply brief makes  an additional argument as to why the Sheriff and District Attorney should be deemed to be in privity with Seneca County.  Namely, because Seneca County funded and controlled the defense in *Gould*.  In support of this privity argument, the Cayuga Nation has submitted minutes from meetings of the Seneca County Board of Supervisors, which, the Nation contends, show that the County funded and controlled the defense in *Gould*.  However, arguments raised for the first time in a reply brief  may be disregarded.  *See, e.g., In re Dobbs*, 227 F. App'x 63, 64 (2d Cir. 2007) ("[W]e think that it was entirely proper for the District Court to decline to consider debtor-appellant's argument, raised for the first time in its reply brief, regarding proximate causation.").  Here, the County did not have an opportunity to respond to the Nation's legal argument, or to challenge the Nation's submission of matters outside of the pleadings.  Accordingly the Court will not consider this aspect of the Cayugas' collateral-estoppel-privity argument, and will instead consider the original basis for the Cayuga Nation's privity argument, which is that privity exists because the *Gould* defendants were sued in their official capacities.

with those county officials,[23] and also denies that the issue presented in this action is the same issue decided in *Gould*.

The Cayuga Nation's collateral estoppel argument is made pursuant to FRCP 12(b)(6), and the standard for determining such motions is clear:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. We construe all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.[24]  In its review, the Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents "integral" to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Heckman v. Town of Hempstead*, No. 13–1379–cv, 568 F. App'x 41, 43 (2d Cir. Jun. 3, 2014) (citations and internal quotation marks omitted).

Collateral estoppel is an affirmative defense. *See, Austin v. Fischer*, 453 F. App'x 80, 82, 2011 WL 6450728 at *1 (2d Cir. Dec. 23, 2011) ("Issue preclusion, or collateral estoppel, is an affirmative defense that normally must be pled in a timely manner or it may be waived.") (citation and internal quotation marks omitted).  A Rule 12(b)(6) motion to dismiss based upon an affirmative defense cannot be granted unless it is clear from the face of the pleading that the claim is barred as a matter of law. *See,*

---

[23]The County maintains that "New York courts have consistently held that district attorneys and counties 'are separate entities which do not stand in sufficient relationship with each other to warrant the invocation of the doctrine of collateral estoppel," citing *Sacoccio v. Lange*, 194 A.D.2d 794, 795 (2d Dept. 1993).  The County argues that is because "law enforcement authorities and civil authorities serve different purposes and responsibilities," and that no privity exists here because the *Gould* civil action arose in response to a criminal prosecution.

[24]"Although a court must accept as true all the factual allegations in the complaint, that requirement is inapplicable to legal conclusions." *Shannon v. Venettozzi*, No. 15-2484, --- Fed.Appx. --- , 2016 WL 6768497 at *1 (2d Cir. Nov. 15, 2016). For example, the Court is not required to accept Seneca County's contention, in its counterclaim, that "[t]he Treaty of Buffalo Creek of 1838 disestablished any Nation reservation in New York," since that is a legal conclusion.  Answer with Counterclaim at ¶ 35.

*Deswal v. U.S. Nat. Ass'n*, 603 F. App'x 22, 23–24 (2d Cir. Mar. 12, 2015) ("Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint.") (citations omitted); *see also, Garcia v. Does*, 779 F.3d 84, 96–97 (2d Cir. 2015) ("It is certainly true that motions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road.").

Particularly as to 12(b)(6) motions concerning collateral estoppel, the Second Circuit has stated:

> When a defendant raises the affirmative defense of . . . collateral estoppel and it is clear from the face of the complaint that the plaintiff's claims are barred as a matter of law, dismissal under Fed.R.Civ.P. 12(b)(6) is appropriate.

*Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*, 270 F. App'x at 53 (citations and internal quotation marks omitted); *see also, Wachtmeister v. Swiesz*, 59 F. App'x 428, 429 (2d Cir. 2003) ("Dismissal under Rule 12(b)(6) is appropriate when a [party] raises collateral estoppel, or issue preclusion, as an affirmative defense and it is clear from the face of the [pleading], and consideration of matters which the court may take judicial notice of, that the plaintiff's claims are barred as a matter of law.").

The general legal principles concerning the doctrine of collateral estoppel are well settled: "Under the doctrine of collateral estoppel (issue preclusion), a [party] is prevented from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*, 270 F. App'x at 53 (2d Cir. 2008) (citation and internal quotation marks

omitted).  The *Gould* decision, upon which the Cayugas rely, is a state-court judgment, and

> a federal court must give to a state-court judgment the same preclusive
> effect as would be given that judgment under the law of the State in which
> the judgment was rendered.  Under New York law, the doctrine of issue
> preclusion only applies if (1) the issue in question was actually and
> necessarily decided in a prior proceeding, and (2) the party against whom
> the doctrine is asserted had a full and fair opportunity to litigate the issue
> in the first proceeding.

*Mejia v. N.Y. City Health & Hosps. Corp.*, 622 F. App'x 70, 71 (2d Cir. 2015) (citations and internal quotation marks omitted).

> The litigant seeking the benefit of collateral estoppel must demonstrate
> that the decisive issue was necessarily decided in the prior action against
> a party, or one in privity with a party. The party to be precluded from
> relitigating the issue bears the burden of demonstrating the absence of a
> full and fair opportunity to contest the prior determination.

*Buechel v. Bain*, 97 N.Y.2d 295, 304, 766 N.E.2d 914, 919 (2001) (citation omitted), *cert den.*, 535 U.S. 1096 (2002).

To be clear,  "the party seeking the benefit of the [collateral estoppel] doctrine . . . bears the initial burden of demonstrating that there is privity." *State v. Zurich Am. Ins. Co.*, 106 A.D.3d 1222, 1223, 965 N.Y.S.2d 206, 208 (1st Dept. 2013); *see also, Bielby v. Middaugh*, 120 A.D.3d 896, 898, 991 N.Y.S.2d 813, 816 (4th Dept. 2014) ("The litigant seeking the benefit of collateral estoppel must demonstrate that the decisive issue was necessarily decided in the prior action against a party, or one in privity with a party.") (quoting *Buechel v. Bain*); *Davidson v. Am. Bio Medica Corp.*, 299 A.D.2d 390, 391, 749 N.Y.S.2d 98, 99 (2d Dept. 2002) ("ABM [the party invoking collateral estoppel] failed to establish that the plaintiff was in privity with any of the parties involved in the

Maryland action.").

The New York Court of Appeals has indicated that it can be difficult to determine whether such privity exists, and that doubts should be resolved against the application of the doctrine:

> In the context of collateral estoppel, privity does not have a single well-defined meaning. Rather, privity is an amorphous concept not easy of application and includes those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and those who are coparties to a prior action. In addressing privity, courts must carefully analyze whether  the party sought to be bound and the party against whom the litigated issue was decided have a relationship that would justify preclusion, and whether preclusion, with its severe consequences, would be fair under the particular circumstances. Doubts should be resolved against imposing preclusion to ensure that the party to be bound can be considered to have had a full and fair opportunity to litigate.

*Buechel v. Bain*, 97 N.Y.2d at 304–05, 766 N.E.2d at 920 (citations and internal quotation marks omitted); *see also, McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007) ("Importantly, we have also cautioned that issue preclusion will apply only if it is *quite clear* that these requirements have been satisfied, lest a party be precluded from obtaining at least one full hearing on his or her claim.") (emphasis in original, citation and internal quotation marks omitted).

When considering the potential preclusive effect of prior *federal-court* judgments, federal courts generally hold that for purposes of res judicata and/or collateral estoppel, a government entity is considered to be in privity with an official of that same government who was previously sued in his official capacity. *See, O'Connor v. Pierson*, 568 F.3d 64, 71 (2d Cir. 2009) ("'As long as the government entity receives notice and

an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.' We therefore agree with the district court that the parties in the two actions [(A Board of Education and board members sued in their official capacities)] are in privity for purposes of res judicata.") (quoting *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985), other citations omitted).

However, New York state courts will not necessarily find privity between a municipality and a municipal official sued in his official capacity. Particularly as regards privity between members of the same municipal entity, another District Judge in this Circuit recently stated the applicable New York law as follows:

> In analyzing whether privity between two government agencies exists for purposes of collateral estoppel, the New York State Court of Appeals has looked to the Restatement Second of Judgments, which provides that:
>
> > If the second action involves an agency or official whose functions and responsibilities are so distinct from those of the agency or official in the first action that applying preclusion would interfere with the proper allocation of authority between them, the earlier judgment should not be given preclusive effect in the second action.
>
> [*Juan C. v.*] *Cortines*, 89 N.Y.2d [659,] 669, 679 N.E.2d [1061,] 1066 [(1997)] (quoting Restatement (Second) of Judgments § 36, cmt. f). Accordingly, in certain situations, a final decision on the merits that binds one government agency may not bind a different government agency. This [Court] has noted that New York courts have largely refused to find two functionally independent governmental entities in privity with each other for purposes of preclusion.

*State of N.Y. v. Mountain Tobacco Co.*, No. 12-CV-6276(JS)(SIL), 2016 WL 3962992, at *12 (E.D.N.Y. July 21, 2016) (some citations and internal quotation marks omitted); *see also, City of N.Y. v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 267 (E.D.N.Y. 2004)

("New York courts have largely refused to find two functionally independent governmental entities in privity with each other for purposes of preclusion."); *see also, id.* ("In *Juan C. v. Cortines*, the New York Court of Appeals . . . [i]n determining whether the [governmental officials] could be considered in privity for purposes of preclusion . . . looked to the "nature, particular function, and purpose" of the two governmental entities[, and] . . . to the actual relationship between the two agencies.") (citations omitted); *Evergreen Bank N.A. v. Dashnaw*, 246 A.D.2d 814, 816, 668 N.Y.S.2d 256, 258 (1998) ("The concept requires a flexible analysis of the facts and circumstances of *the actual relationship between the party and nonparty in the prior litigation*[.]") (emphasis added, citation omitted).

Applying this standard in *Juan C. v. Cortines*, the New York Court of Appeals found that there was not sufficient privity between members of the same New York City municipal government. Specifically, the Court of Appeals held that the New York City Corporation Counsel, which had represented the City in a Family Court Juvenile Delinquency proceeding involving a high school student, and New York City School personnel, who subsequently conducted a disciplinary hearing involving the same student, were not in privity. In that regard, the court noted that the City School personnel were not parties to the earlier Family Court proceeding, and that their authority was "distinctively separate from other usual City operations and powers and specifically distinct from the Corporation Counsel's role [in Family Court proceedings.]." *Id.*, 89 N.Y.2d at 666.

In the instant case, the Cayuga Nation cites federal-court decisions for the proposition that governmental officials sued in their official capacities are deemed to be

"in privity" with the governmental entity that they serve.[25]  However, none of the cases cited by the Nation for that proposition applied New York law.[26]  Nor is the Court able to find any decision by a New York court finding privity, for purposes res judicata/collateral estoppel, based upon the relationship between a municipality and municipal official sued in his official capacity.  Applying the standards of New York State law set forth above, the Court does not believe that privity is established merely because the Sheriff and District Attorney were sued in their official capacities in the *Gould* action.  Nor does the Cayuga Nation's motion attempt to make the fact-specific showing required by New York law.[27]  Accordingly, the Nation has not shown, in the first instance, sufficient privity between the Seneca County and the *Gould* defendants to warrant the application of collateral estoppel. *See, State v. Zurich Am. Ins. Co.*, 106 A.D.3d at 1223, 965 N.Y.S.2d at 208 ("[T]he party seeking the benefit of the [collateral estoppel] doctrine . . . bears the initial burden of demonstrating that there is privity.").  The Nation's motion to dismiss, based on collateral estoppel, can be denied on that basis alone.

Further, the Court's own examination of the particular functions and purposes of the governmental entities involved here (Seneca County versus Seneca County Sheriff and Seneca County District Attorney), as well as their relationship in the prior *Gould* litigation, does not necessarily establish the required privity under New York law.  To begin with, the Cayuga Nation has not shown that Seneca County was an actual party in *Gould*, or that it had any "legal or functional status" in that action. *See, Juan C.*, 89 N.Y.2d. at 672 (Appellants " had no legal or functional party status in the Family Court

---

[25]Pl. Memo of Law [#39-1] at p. 12.
[26]*See*, Pl. Memo of Law [#39-1] at p. 12.  Additionally, two of the three cases cited by the Nation involved consideration of the preclusive effect of prior federal-court judgments. *Id.*
[27]*See*, Pl. Memo of Law [#39-1] at pp. 12-13.

proceeding."). Rather, in *Gould* the Cayuga Nation sued the sheriffs and district attorneys of Seneca and Cayuga Counties, after those law enforcement officials executed search warrants at two Cayuga-owned convenience stores selling cigarettes without tax stamps, and seized the un-stamped cigarettes. The sheriffs and district attorneys maintained that the Cayuga Nation's retailers were violating New York Tax Law § 471, which imposed sales taxes on cigarettes, and which, if willfully evaded, could result in prosecution for a felony. In obtaining and executing the search warrants, the sheriffs and district attorneys were ostensibly acting in their unique roles as independently-elected law enforcement officials, with the district attorneys, at least, acting on behalf of the People of the State of New York.[28] *See, Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) ("When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.").[29] Indeed, the dissenting opinion in the 4-3 *Gould* decision repeatedly refers only to "the State" and "the Cayuga Nation," not Seneca County or Cayuga County, and the majority opinion described the case as being a dispute not between the counties and the Cayuga Nation, but as "a dispute between law enforcement authorities and the Cayuga Indian Nation." *Gould*, 14 N.Y.3d at 622. Meanwhile, the instant case involves Seneca County itself, not the Sheriff or District Attorney, and the County's efforts to collect county real property taxes through civil proceedings.

---

[28]The Nation contends that the sheriffs and district attorneys were actually acting as "proxies" for the Counties, who allegedly funded and directed the defense in *Gould*, but the Court has already explained that it is not considering that argument because it was raised for the first time in the Cayuga reply brief.

[29]Of course, the District Attorney is nevertheless an officer of the County. *Claude H. v. Cty. of Oneida*, 214 A.D.2d 964, 966, 626 N.Y.S.2d 933, 935 (4th Dept. 1995) ("It is well established that a District Attorney is a local officer of the county rather than of the State.") (citations omitted).

Based upon all of the foregoing, the Court finds that the Cayuga Nation has not demonstrated the necessary privity, between Seneca County and the *Gould* defendants, for collateral estoppel to arise under New York law. However, even if the Cayuga Nation had made a sufficient showing of privity, the Court would nonetheless find that the Cayuga Nation has failed to show that the issue presented by Seneca County's counterclaim — whether the 1838 Treaty of Buffalo Creek disestablished the Cayuga reservation — was decided by the Court in *Gould*. In fact, the court in *Gould* did not purport to make its own determination of that issue. Rather, the court in *Gould* merely purported to determine whether, as of that date, the federal government recognized the Cayuga reservation as still existing. As part of that discussion, the court in *Gould* noted that no federal court had, as of that date, accepted the argument that the 1838 Treaty of Buffalo Creek disestablished the Cayuga reservation.[30] Again, though, the *Gould* court did not purport to decide whether in fact the 1838 Treaty of Buffalo Creek disestablished the Cayuga reservation.

For all of the reasons discussed above, the Cayuga Nation's application to dismiss the counterclaim based upon collateral estoppel is denied.

<u>Motion to Dismiss for Failure to State a Claim</u>

The third and final basis for the Cayuga Nation's motion to dismiss the counterclaim is that it fails to state an actionable claim, because as a matter of law, the

---

[30]*Gould*, 904 N.Y.S.2d at 326. In arriving at this conclusion, the court in *Gould* made three observations: First, that the Second Circuit, in *Cayuga Indian Nation v. Pataki*, 413 F.3d 266, 269 n. 2 (2d Cir. 2005), had commented that the Treaty of Buffalo Creek did not mention Cayuga land or title; second, that two U.S. District Court cases had found that the Treaty of Buffalo Creek did not disestablish the Cayuga reservation; and third, that the U.S. Department of Interior had identified the land in question in that case as being within the Cayuga reservation. The Court does not believe that any of those facts would have prevented the court in *Gould* from making its own determination as to whether the Cayuga reservation had been disestablished if it had wanted to do so.

1838 Treaty of Buffalo Creek did not disestablish the Cayuga Reservation, contrary to what the counterclaim asserts. In the regard, the Cayuga motion refers to the counterclaim as "the County's *disestablishment claim*,"[31] referring to the County's contention that "[t]he Treaty of Buffalo Creek of 1838 disestablished any [Cayuga] Nation reservation in New York."[32]

The Court believes that the Cayuga Nation is correct in characterizing the counterclaim as the County's "disestablishment claim." On this point, the counterclaim makes the following factual assertions, in pertinent part:

> The Nation concluded a treaty with the State of New York on or about February 25, 1789, under which the Nation ceded all of its lands to New York, except for 64,015 acres of land that constituted the Nation's "Original Reservation."
>
> The Subject Properties are located within the "Original Reservation."
>
> On or about July 27, 1795, the Nation entered into a treaty with the State of New York under which New York acquired the entire "Original Reservation," except for a three-square-mile parcel.
>
> In 1807, the State of New York purchased the remaining three-square-mile parcel in the "Original Reservation" from the Nation.
>
> The Treaty of Buffalo Creek of 1838 was ratified by the Senate and proclaimed by the President of the United States.
>
> The Treaty of Buffalo Creek of 1838 disestablished any Nation reservation in New York.

---

[31]Pl. Memo of Law [#39-1] at p. 12 (emphasis added).
[32]Answer with Counterclaim [#37] at ¶ 35.

> As a result of the foregoing, any and all right, title, and interest of the Nation to the "Original Reservation" had lawfully extinguished and the State of New York held full title to these lands.

Answer to Amended Complaint with Counterclaim [#37] at ¶ ¶ 30-36 (paragraph numbers omitted). Although the counterclaim seeks a declaration that "the Subject Properties are not now an Indian reservation for purposes of New York Real Property Tax Law § 454 or Indian Law § 6 or "Indian country" for purposes of 18 U.S.C. § 1151," the counterclaim alleges that the subject lands are not covered by the aforementioned statutes because, and only because, the Cayuga reservation has been disestablished.[33] Consequently, pursuant to the 12(b)(6) standard set forth earlier in this decision, the counterclaim cannot survive the Cayuga Nation's motion to dismiss unless it plausibly pleads that the Cayuga reservation was disestablished. The Court finds that it does not.

Significantly, the counterclaim fails to mention that between the time when the "Original Reservation" was established (February 25, 1789) and the time when the State of New York purchased all of the "Original Reservation" (1795 -1807), at least three important things occurred: First, on March 4, 1789, the U.S. Constitution became effective, "grant[ing] the federal government authority over Indian affairs" which had previously belonged to the individual states, *Citizens Against Casino Gambling in Erie*

---

[33]The Court points this out preliminarily because, in the County's response [#40] to the Cayuga Nation's motion to dismiss, the County's first argument in defense of the merits of the counterclaim does not pertain to disestablishment. Rather, the County begins by arguing that the counterclaim is not "foreclosed by precedent," because "the issue of whether the Nation's claimed lands would constitute a 'reservation' under N.Y. Real Property Tax Law § 454 or N.Y. Indian Law § 6 has not been addressed in any of the cases cited by the Nation." This argument seems to mean that there is no binding precedent concerning whether the subject parcels would be considered reservation lands under those statutes if the Cayuga reservation was *not* disestablished; if the Cayuga reservation *was* disestablished, it does not seem that there would be much debate over whether the lands would qualify as "reservation" under those statutes -- they would not. Since the whole focus of the counterclaim is the assertion that the Cayuga reservation has been disestablished, the County's lead-off argument really seems to be more directed against the merits of the Cayuga Nation's second cause of action than in support of the counterclaim.

*County v. Hogen*, No. 07-CV-0451S, 2008 WL 2746566 at *5 (W.D.N.Y. Jul. 8, 2008);[34] second, in 1790 the U.S. enacted the "Non-Intercourse Act," which "prohibited the conveyance of Indian land except where such conveyances were entered pursuant to the treaty power of the United States;"[35] and third, on November 11, 1794, the Cayuga Nation and the fledgling Federal Government entered into the Treaty of Canandaigua, which effectively recognized the Cayuga "Original Reservation" as a federal Indian reservation. *See, Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d at 268–69 ("On November 11, 1794, the Six Iroquois Nations entered the Treaty of Canandaigua with the United States. 7 Stat. 44. This treaty acknowledged the Original Reservation the Cayugas retained in the 1789 treaty with New York, and promised the Cayugas that the land would remain theirs until they "chose to sell the same to the people of the United States who have the right to purchase." *Id.* art. II, 7 Stat. at 45.") (footnote omitted).

Because of these events, at all relevant times the State of New York lacked the authority to "disestablish" the Cayuga Reservation in any manner, including its purported purchases of the Reservation lands in 1795 and 1807. Rather, only the federal government could disestablish the Cayuga Reservation:

---

[34] *See also, id.* ("Its adoption removed any doubt as to whether, under the Articles of Confederation, certain rights over Indians continued to be reserved to the states.") (citation omitted); *Seneca Nation of Indians v. N.Y.*, 206 F. Supp. 2d 448, 482 (W.D.N.Y. 2002) ("The United States Constitution became effective on March 4, 1789.19 The Indian Commerce Clause of the Constitution, art. I, § 8, cl. 3, gave the federal government the sole power over Indian affairs and put to rest the dispute between the national government and the states under the Articles of Confederation as to who had authority to deal with Indian matters.") (footnote omitted), *aff'd*, 382 F.3d 245 (2d Cir. 2004)

[35] *Oneida County, N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 232, 105 S.Ct. 1245, 1250 (1985); *see also, id.* (" In 1793, Congress passed a stronger, more detailed version of the Act, providing that "no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution ... [and] in the presence, and with the approbation of the commissioner or commissioners of the United States" appointed to supervise such transactions. 1 Stat. 330, § 8. Unlike the 1790 version, the new statute included criminal penalties for violation of its terms. Ibid.").

[O]nly Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress *explicitly* indicates otherwise.

*Solem v. Bartlett*, 465 U.S. 463, 470, 104 S. Ct. 1161, 1166, 79 L. Ed. 2d 443 (1984) (emphasis added); *see also, City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 544 U.S. at 216, 125 S. Ct. at 1491, n. 9 ("The Court has recognized that 'only Congress can divest a reservation of its land and diminish its boundaries.'") (quoting *Solem v. Bartlett*). Indeed, very recently the Supreme Court reiterated its holding in *Solem*, stating: "Only Congress can divest a reservation of its land and diminish its boundaries, and its intent to do so must be clear." *Nebraska v. Parker*, 136 S.Ct. at 1078-1079 (quoting *Solem*).

Consequently, while the counterclaim appears to suggest that the State of New York's purchases of the Cayuga Nations' land, in 1795 and 1807, respectively, somehow contributed to the disestablishment of the Cayuga Reservation, that assertion lacks merit since those transactions indisputably violated the Non-Intercourse Act, and were never subsequently approved through the federal treaty-ratification procedures.[36] *See, Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d at 269 ("Although there is some debate about whether a federal official who signed the [1795] treaty [between the State

---

[36]Rather, it seems that at most, the federal government declined to exercise its power to set aside the sales, even though it clearly opposed the 1795 sale, and even though both sales violated the Non-Intercourse Act as well as the U.S. Constitution. *See, e.g., Cayuga Indian Nation of New York v. Pataki*, 165 F.Supp.2d 266, 315 (N.D.N.Y. 2001) (Noting that despite "unequivocal language" in the U.S. Constitution Art. I § 10 and Art. II, § 2, the State of New York "forged ahead on its own" and made treaties with Indian nations including the Cayuga), *rev'd on other grounds*, 413 F.2d 266 (2005); *id.* at 335 (President Washington opposed the 1795 sale, but felt that it might be "too late" to set it aside if it had already transpired); *id.* at 340 ("[B]oth President Washington and Secretary of War Pickering seemed content to let the matter rest given that, in a manner of speaking, the damage had already been done.") (citation omitted).

of New York and the Cayuga Indians] as a witness was acting in his personal or official capacity, it is undisputed that this treaty was never explicitly ratified by a treaty of the Federal Government. In 1807, the State of New York purchased the Cayugas' remaining three-square-mile parcel [but,] [a]gain, the Federal Government never explicitly ratified this treaty."); *see also, Cayuga Indian Nation of N.Y. v. Cuomo*, 730 F. Supp. 485, 493 (N.D.N.Y. 1990) ("The defendants have been unable to establish a genuine issue of material fact concerning alleged ratification by the federal government of the 1795 and 1807 land conveyances at issue. [Despite having had over two years to conduct discovery.] There is no evidence before this court that the President, with the advice and consent of the Senate, ever ratified these conveyances by an express federal treaty."); *Cayuga Indian Nation of N.Y. v. Pataki*, 165 F. Supp. 2d 266, 353 (N.D.N.Y. 2001) ("Like the 1795 Treaty, this court has previously held that this 1807 Treaty was not ratified by the federal government in accordance with Article II, Section 2 of the U.S. Constitution, and hence plaintiffs established a prima facie case of a Nonintercourse Act violation.") (internal quotation marks omitted), *rev'd on other grounds*, 413 F.3d 266 (2d Cir. 2005). Accordingly, to the extent that Seneca County's counterclaim contends that 1795 and 1807 transactions between New York State and the Cayuga Nation had any effect on the legal status of the Cayuga reservation, such contention lacks merit as a matter of law.

For the counterclaim to have merit, therefore, it must plausibly allege that some act of Congress disestablished the Cayuga Reservation. However, the only federal action mentioned in the subject counterclaim that could possibly have disestablished the

Cayuga Reservation is the Treaty of Buffalo Creek,[37] which, for the reasons discussed

below, did not have that effect.

At the outset, the legal standard for determining whether Congress has

disestablished an Indian reservation is clear:

> Congress possesses plenary power over Indian affairs, including the
> power to modify or eliminate tribal rights. Accordingly, only Congress can
> alter the terms of an Indian treaty by diminishing a reservation, and its
> intent to do so must be clear and plain.
>
> ***
>
> Our inquiry is informed by the understanding that, at the turn of this
> century, Congress did not view the distinction between acquiring Indian
> property and assuming jurisdiction over Indian territory as a critical one, in
> part because the notion that reservation status of Indian lands might not
> be coextensive with tribal ownership was unfamiliar, and in part because
> Congress then assumed that the reservation system would fade over time.
> Given this expectation, Congress naturally failed to be meticulous in
> clarifying whether a particular piece of legislation formally sliced a certain
> parcel of land off one reservation. Thus, although the most probative
> evidence of diminishment is, of course, the statutory language used to
> open the Indian lands, we have held that we will also consider "the
> historical context surrounding the [legislation or treaty], and, to a lesser
> extent, the subsequent treatment of the area in question and the pattern of
> settlement there. Throughout this inquiry, we resolve any ambiguities in
> favor of the Indians, and we will not lightly find diminishment.

*S. Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343–44, 118 S. Ct. 789, 798, 139 L.

Ed. 2d 773 (1998) (citations and internal quotation marks omitted); *accord, Nebraska v.*

---

[37]The Counterclaim alleges that "as a result of the foregoing," the Cayuga Reservation was "extinguished." Answer to Amended Complaint with Counterclaim [#37] at ¶ 36. The "foregoing" to which that statement refers are the factual averments concerning the purchases of Cayuga lands by the State of New York and the factual averments concerning the Treaty of Buffalo Creek. Since the purchases of land could not have extinguished the Cayuga Reservation, then the only remaining possibility is that the Treaty of Buffalo Creek did so. These are the only theories presented by the Counterclaim. (The Counterclaim goes on to allege that "[t]he subsequent history and treatment of the land located within what had been the "Original Reservation" demonstrate and confirm that the former Nation reservation was disestablished long ago." *Id.* at ¶ 39.

*Parker*, 136 S.Ct. at 1078-1079.

To summarize, the three factors for determining whether a federal treaty has disestablished an Indian reservation are 1) the language of the treaty; 2) the historical context surrounding the treaty; and 3) the subsequent treatment of the land and the pattern of settlement, which is the least important factor.  Explicit treaty language, while obviously the most probative evidence, is nonetheless not always required if the treaty's legislative history, and/or the subsequent treatment of the land "unequivocally" indicate that disestablishment was intended by the treaty.[38]  However, "mixed historical evidence . . . cannot overcome the lack of clear textual signal that Congress intended to diminish the reservation." *Nebraska v. Parker*, 136 S.Ct. at 1080.  Moreover, the Supreme Court has never relied solely on the third category of evidence -- "evidence concerning the subsequent treatment of the land and the pattern of settlement" -- to demonstrate disestablishment of a reservation. *Id.*, 136 S.Ct. at 1081-1082 ("[E]vidence of the changing demographics of disputed land is the least compelling evidence in our diminishment analysis, for every [transfer of reservation land, whether authorized or not] necessarily resulted in a surge of non-Indian settlement.  . . .  [Similarly, e]vidence of the subsequent treatment of the disputed land by Government officials likewise has limited interpretive value.") (citation and internal quotation marks omitted).

---

[38] *See, Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y.*, 337 F.3d 139, 159 (2d Cir. 2003) ("Although explicit reference to cession or other language evidencing the present and total surrender of all tribal interests can be helpfully probative, particularly when buttressed by fixed compensation for the opened lands, this language is not a prerequisite for a finding of diminishment. Rather, an act's legislative history and the subsequent treatment of the land (including settlement patterns), may also suffice[.]") (citation and internal quotation marks omitted), rev'd and remanded, 544 U.S. 197, 125 S. Ct. 1478, 161 L. Ed. 2d 386 (2005).  Such evidence must be unequivocal. *Nebraska v. Parker*, 136 S.Ct. at 1079 ("[O]ur precedents also look to any 'unequivocal evidence' of the contemporaneous and subsequent understandings of the status of the reservation[.]").

Applying these standards to the 1838 Treaty of Buffalo Creek, District Judges in this Circuit have uniformly concluded that the treaty did not disestablish the Cayuga Reservation, either directly or by belatedly ratifying the 1795 and 1807 sales to the State of New York. *See, e.g., Cayuga Indian Nation v. Cuomo*, 730 F.Supp. at 492-493 ("[D]efendants' contention that the 1795 and 1807 conveyances were ratified by the subsequent ratification of the Buffalo Creek treaty is without merit.") (McCurn, J.); *Cayuga Indian Nation of New York v. Village of Union Springs*, 317 F.Supp.2d 128, 137-143 (N.D.N.Y. 2004) (" After consideration of both the plain language of the Buffalo Creek Treaty as well as the legislative history and subsequent treatment of the land relating thereto, there is no substantial or compelling evidence that said Treaty served to terminate the Cayugas' reservation.") (Hurd, J.).  Seneca County's counterclaim fails either to suggest that any of the three factors listed above support its bare assertion that the Treaty of Buffalo Creek disestablished the Cayuga reservation, or to otherwise cast doubt on these thorough and well-reasoned district court opinions.

The Court of Appeals for the Second Circuit has not indicated whether the 1838 Treaty of Buffalo Creek disestablished the Cayuga reservation, although it has at least implied that this position lacks merit, by pointing out that the Treaty of Buffalo Creek fails to even mention "Cayuga land or Cayuga title."[39]  Moreover, the Second Circuit has repeatedly indicated that the same treaty did not disestablish the *Oneida* reservation. *See, Oneida v. City of Sherrill*, 337 F.3d 139, 160- (2d Cir. 2003) ("Construing the

---

[39]*Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d at  269 n. 2 ("Defendants claim that the 1838 treat of Buffalo Creek effectively ratified these treaties. [1795 and 1807 treaties between the State of New York and the Cayuga Nation, by which the State obtained the Tribe's lands].  Although we ultimately need not reach this question, we note that, whatever it may do, the Treaty of Buffalo Creek neither mentions Cayuga land or Cayuga title in New York, nor refers to the 1795 or 1807 treaties.").

Buffalo Creek Treaty liberally and resolving, as we must, all ambiguities in the Oneidas' favor, we conclude that neither its text nor the circumstances surrounding its passage and implementation establish a clear congressional purpose to disestablish or diminish the OIN reservation."), reversed on other grounds, *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 125 S.Ct. 1478 (2005); *Oneida Indian Nation of New York v. Madison County*, 605 F.3d at 157 n. 6 ("[Because the Supreme Court in *Sherrill* declined to resolve the question,] [o]ur prior holding on this question – that the Oneidas' reservation was not disestablished – therefore remains the controlling law of this circuit.") (citation and internal quotation marks omitted); *Oneida Indian Nation of New York v. Madison County*, 665 F.3d 408, 443 (2d Cir. 2011) ("It remains the law of this Circuit that the Oneidas' reservation was not disestablished."); *Central New York Fair Business Assoc. v. Jewell*, --- Fed.Appx. ---, 2016 WL 7177757 at *2 (2d Cir. Dec. 9, 2016) (Reiterating that Oneida reservation "was not disestablished by the 1838 Treaty of Buffalo Creek.").[40]

In arriving at this conclusion, the Second Circuit began by examining the text of the 1838 Treaty of Buffalo Creek, and noting that the "central bargain" of the treaty was "the cession of New York Indians' *Wisconsin* lands in exchange for reservation land in Kansas." *Oneida Indian Nation v. City of Sherrill*, 337 F.3d at 160 (emphasis added). Next, the court noted that, unlike the treaty's provisions pertaining to the Seneca and Tuscarora Indians, which disestablished those tribes' New York reservations, the provision pertaining to the Oneidas did not provide "substantial and compelling

---

[40]Accordingly, the County's argument that this Court should reject the Second Circuit's ruling in *Sherrill*, concerning the effect of the Treaty of Buffalo Creek on the Oneida reservation, because the Supreme Court vacated the decision on other grounds, lacks merit.

evidence" of Congressional intention to disestablish the Oneida reservation. *Id.* at 161-162. Further, the court found that the legislative history of the treaty "indicate[d] little if anything about Congress's intent in 1838." *Id.* at 162. The court further found that even the federal government's well-documented "Indian removal policy," which involved moving the Indians westward, and in particular out of New York, was insufficient proof of an intent to disestablish the Oneida reservation, since the treaty failed to clearly indicate that the Oneidas were required to leave New York. *Id.* at 163. Finally, the court determined that the subsequent treatment of the Oneida lands, including the pattern of settlement by white settlers, was not clearly indicative of Congressional intent to disestablish the reservation. *Id.* at 164. Significantly, on this point the court stated:

> Because the Oneidas sold most of their land to the State or private parties well *before* the Buffalo Creek Treaty and the flood of non-Indians into the area is not clearly linked to the Treaty, the gradual reduction in the number of Oneidas living on their reservation does not reflect a clear congressional intent to disestablish it.

*Id.* at 164 (emphasis added). In sum, the court found that none of the three factors set forth above clearly indicated that Congress intended the 1838 Treaty of Buffalo Creek to disestablish the Oneida reservation.

This determination is essentially dispositive of Seneca County's counterclaim, since there is no appreciable difference between the Oneidas and the Cayugas with regard to the aforementioned analysis. That is, in both cases there is only ambiguous treaty language and historical evidence that is "mixed" at best, which cannot as a matter of law prove disestablishment. *Nebraska v. Parker*, 136 S.Ct. at 1080.

To begin with, the treaty provision concerning the Cayuga Nation (Article 11) is at least as ambiguous as the provision concerning the Oneidas (Article 13), and arguably even more so, since it contains no reference whatsoever to Cayuga-owned lands.[41] This is not surprising, since in 1838 the Cayuga Nation owned no lands in New York (having sold all of their land to the State of New York) and were residing on the Seneca reservation.   In the Court's view, such fact effectively disproves any Congressional intention to disestablish the Cayuga reservation via the Treaty of Buffalo Creek, since, according to no less an authority than the Supreme Court, it was commonly understood at that time that the Cayuga no longer had a reservation to disestablish, due to their transfer of fee title to the State of New York decades earlier. *See*, *S. Dakota v. Yankton Sioux Tribe*, 118 S. Ct. at 798 ("[A]t the turn of this century, Congress did not view the distinction between acquiring Indian property and assuming jurisdiction over Indian territory as a critical one, in part because *the notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar* [.]") (emphasis added).  That being the case, as concerns the Cayuga Indians, the intent of the Treaty of Buffalo Creek would merely have been to move the Indians themselves west, without any thought being given to disestablishing the then-seemingly-non-existent Cayuga reservation.[42]   In any event, the text of the treaty does not clearly indicate an intent to

---

[41]Article 11 states, in its entirety: "The United States will set apart for the Cayugas, on their removing to their new homes at the west, two thousand dollars, and will invest the same in some safe stocks, the income of which shall be paid them annually, at their new homes.  The United States further agree to pay to the said nation, on their removal west, two thousand five hundred dollars, to be disposed of as the chiefs shall deem just and equitable." 7 Stat. 550, 1838 WL 4507 (1838).
[42]*See, Cayuga Indian Nation of New York v. Village of Union Springs*, 317 F.Supp.2d 128, 142 ("By the time of the 1838 Treaty, the Cayugas' reservation had purportedly been transferred to the State of New York via the 1795 Treaty of Cayuga Ferry.  Although said treaty was in violation of the Nonintercourse Act, nonetheless as it relates to the intent of the parties in 1838, the Cayugas could not have intended to relinquish rights to land that they did not believe they held.") (citations omitted).

disestablish the subject Cayuga reservation. *See, Cayuga Indian Nation of New York v. Village of Union Springs*, 317 F.Supp.2d at 140-142 (Explaining why the treaty language fails to provide compelling evidence of congressional intent to disestablish the Cayuga reservation).

Nor does there appear there appear to be any clear contemporaneous evidence of Congressional intent concerning the treaty's intended effect on the Cayuga Nation. On this point, the Second Circuit's discussion in *Oneida Indian Nation of New York v. City of Sherrill* appears to be equally applicable to the Cayuga Nation. *See also, Cayuga Indian Nation of New York v. Village of Union Springs*, 317 F.Supp.2d at 142-143 (Finding "no substantial or compelling evidence" concerning congressional intent). More importantly, the counterclaim fails to allege any facts from which a reasonable inference can be drawn that there exists clear and unequivocal evidence of congressional intent to have the Treaty of Buffalo Creek disestablish the Cayuga reservation .

And finally, Seneca County cannot rely on the post-treaty treatment of the land or demographic patterns to prove intent.  On this point, the historical evidence is clear that long before the Treaty of Buffalo Creek was executed, the Cayugas had sold all of their reservation lands[43] to the State of New York, which immediately re-sold the properties to third parties. *See, Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d at 163-164 ("Not surprisingly, the most significant population changes occurred when the bulk of the land was alienated."); *see also, Cayuga Indian Nation of New York v. Pataki*, 165 F.Supp.2d at 344 ("In November, 1796, the State auctioned the Cayuga lands

---

[43]Fee title.

[37]

which it had acquired pursuant to the 1795 Cayuga Ferry Treaty.").  The subsequent changes in the use of the land occurred because of those sales, not because of the Treaty of Buffalo Creek.  Indeed, it is not plausible that the 1838 treaty, which did not even mention Cayuga lands, would have had any effect whatsoever on the treatment or use of the subject land.  In any event, even if such evidence existed it would have little value in terms of this analysis, and would not be sufficient to establish a clear congressional intent to disestablish the Cayuga reservation. *See, Nebraska v. Parker*, 136 S.Ct. at 1082 ("Evidence of the subsequent treatment of the disputed land . . . likewise has limited interpretive value.") (citation omitted).

Seneca County nevertheless contends that the aforementioned cases concerning the Oneida Indians have no bearing in this action, because the counterclaim involves factual issues unique to the Cayugas.  Specifically, the County states:

> [T]here are unique factual issues and legal arguments that apply to the Cayugas regarding whether the 1794 Treaty of Canandaigua even recognized a Cayuga reservation under federal law, whether the 1795 and 1807 conveyances by the Nation to the State of New York were made in accordance with the requirements of the Non-Intercourse Act in effect at those times, and whether the 1838 Treaty of Buffalo Creek disestablished any federal Cayuga reservation or implicitly recognized that no federal Cayuga reservation ever existed.

Def. Memo of Law [#40] at pp. 15-16.  However, this contention lacks merit.

To begin with, the counterclaim as currently drafted does not even remotely suggest that the Treaty of Canandaigua failed to recognize the Cayuga reservation under federal law; that the 1795 and 1807 conveyances were made in accordance with the Non-Intercourse act; or that the Treaty of Buffalo Creek "implicitly recognized that no federal Cayuga reservation ever existed."  Rather, the County is making these bare

assertions for the first time, with regard to the counterclaim, in its opposition to the motion to dismiss. For example, the counterclaim does not mention the Non-Intercourse Act, let alone suggest that the 1807 and 1795 sales were made in accordance with that statute. Any such allegation would not be plausible in any event, since there is absolutely not a shred of historical evidence that the United States ever ratified those sales/treaties in accordance with federal treaty-ratification procedures. The counterclaim similarly fails to imply, let alone plead any facts to plausibly suggest, that the Treaty of Canandaigua failed to recognize the Cayuga reservation.[44]

The County similarly argues that based upon the Supreme Court's decision in *Sherrill*, concerning laches, "the County may rightfully argue that reservation status for purposes of the federal and state statutes at issue[45] . . . only includes land over which the Nation exercises sovereign authority, and not the Subject Properties."[46] However, this argument is also not pleaded in, or reasonably implied by, the counterclaim. The existence of a reservation, sovereign authority over land, and laches are three distinct issues, of which the counterclaim mentions only the first.

As the Court has already explained, the counterclaim, which is succinct, is based upon the contention that the Treaty of Buffalo Creek disestablished the Cayuga reservation. *See*, Answer to Amended Complaint with Counterclaim at p. 7, ¶ 43 ("There is a present controversy over whether the Nation's reservation has been disestablished."). The Cayuga Nation tailored its motion to address that claim, and the County cannot evade that motion now by claiming that it pled something other than

---

[44]*See*, Answer to Amended Complaint with Counterclaim [#37], "Counterclaim," at pp. 5-7
[45]18 U.S.C. § 1151, NY RPTL § 454 and NY Indian Law § 6.
[46]Def. Memo of Law [#40] at p. 18.

what it actually pled.[47]

The Court further points out that it conducted its sovereign immunity analysis above based on the counterclaim as actually pleaded, and not on these new arguments. The Cayuga Nation's claim concerning the County's ability to tax the properties is *not* based on the tribe's ability to exert sovereign authority over the land, but rather is based upon the fact that the land is physically located within the historic reservation which has not been disestablished. The Court found that the counterclaim was the mirror image of such claim, and that the Cayuga Nation had therefore waived sovereign immunity from suit as to that issue. To the extent that the County would attempt to plead these newly-raised claims, they would probably be barred by sovereign immunity, since they go beyond mirroring the Cayugas' claim.

The counterclaim fails to state an actionable claim. Binding Supreme Court precedent is clear that a reservation-disestablishment claim cannot succeed where there is only ambiguous treaty language and mixed historical evidence of congressional intent. As a matter of law, the 1838 Treaty of Buffalo Creek does not contain "a clear textual signal that Congress intended to diminish the [Cayuga] reservation."[48] Consequently, Seneca County's counterclaim could only succeed if there existed clear and unequivocal historical evidence that Congress intended the treaty to disestablish the Cayuga reservation. The Counterclaim does not allege any facts to suggest that such evidence exists. Furthermore, for the reasons discussed above, it is clear that any historical evidence on this point would be "mixed" at best. Accordingly, the counterclaim

---

[47] The County has not requested permission to amend its counterclaim to assert these new theories, and the Court would not be inclined to grant any such belated application at this point, for various reasons including unjustifiable delay and futility.

[48] *Nebraska v. Parker*, 136 S.Ct. at 1080.

necessarily fails as a matter of law.

CONCLUSION

Plaintiff's application [#39] to dismiss Defendant's counterclaim is granted, with prejudice.

SO ORDERED.

Dated: Rochester, New York
     April 30, 2017

/s/ Charles J. Siragusa_____<br>CHARLES J. SIRAGUSA<br>United States District Judge